**RIO GRANDE SILVERY MINNOW, Hybognathus amarus; Southwestern Willow Flycatcher (Empidonax trailii extimus); Defenders of Wildlife; Forest Guardians; National Audubon Society; New Mexico Audubon Council; Sierra Club; Southwest Environmental Center, Plaintiffs–Appellees,**

**v.**

**John W. KEYS, III, Commissioner, Bureau of Reclamation; Steve Hanson, Regional Director, Bureau of Reclamation; Bureau of Reclamation, an agency of the United States; Joseph Ballard, General, Chief Engineer, Army Corps of Engineers; Raymond Midkiff, Lt. Col., Albuquerque District Engineer; United States Army Corps of Engineers, an agency of the United States; United States of America; Gale Norton, Secretary, Department of Interior; United States Fish and Wildlife Service, Defendants–Appellants,**

**State of New Mexico; The Middle Rio Grande Conservancy District; City of Albuquerque; Rio De Chama Acequia Association, Defendants–Intervenors–Appellants,**

Double M. Ranch; City of Santa
Fe, Intervenors,

Las Campanas Limited Partnership;
Pacific Legal Foundation; San Juan
Water Commission; National Water
Resources Association; Klamath Wa-
ter Users Association; City and Coun-
ty of Santa Fe; State of Colorado;
State of Idaho; State of Nebraska;
State of Oklahoma; State of South
Dakota; State of Wyoming; Trout
Unlimited; National Wildlife Federa-
tion; Desert Fishes Council; New
Mexico Council of Churches, Amici
Curiae.

Nos. 02–2254, 02–2295, 02–2255,
02–2304, 02–2267.

United States Court of Appeals,
Tenth Circuit.

June 12, 2003.

Interstate Stream Commission, Santa Fe, NM; Peggy E. Montaño, Special Assistant Attorney General of Trout, Witwer & Freeman, P.C., Denver, CO; Fred Abramowitz, Special Assistant Attorney General of Abramowitz & Franks, Albuquerque, NM, with him on the briefs) for Defendant–Intervenor–Appellant State of New Mexico.

Lynn H. Slade of Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, NM, (Maria O'Brien of Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, NM, Charles W. Kolberg and Robert M. White, City of Albuquerque, Legal Department, Albuquerque, NM, with him on the briefs) for Defendant–Intervenor–Appellant City of Albuquerque.

Charles T. DuMars, of Law & Resource Planning Associates, P.C., Albuquerque, NM, (Christina Bruff DuMars and David Seeley, of Law & Resource Planning Associates, P.C., Albuquerque, NM, with him on the briefs) for Defendant–Intervenor–Appellant Middle Rio Grande Conservancy District.

Frank M. Bond of The Simons Firm, LLP, Santa Fe, NM, (Thomas A. Simons, IV, and Faith Kalman Reyes of The Simons Firm, LLP, Santa Fe, NM; Fred J. Waltz, Attorney, Taos, NM, with him on the briefs) for Defendant–Intervenor–Appellant Rio Chama Acequia Association.

Andrew C. Mergen, Attorney, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., (Thomas L. Sansonetti, Assistant Attorney General, Jeffrey Bossert Clark, Deputy Assistant Attorney General; Susan L. Pacholski, Attorney, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., with him on the briefs) for the Defendants–Appellants.

Stephen R. Farris, Assistant Attorney General, State of New Mexico, Santa Fe, NM, (Patricia A. Madrid, Attorney General, Tracy M. Hughes, Assistant Attorney General, State of New Mexico, Santa Fe, NM; John E. Stroud, Special Assistant Attorney General, Karen L. Fisher, Special Assistant Attorney General, Office of the State Engineer and the New Mexico

Alletta Belin, of Belin & Sugarman, Santa Fe, NM, (Steven C. Sugarman of Belin & Sugarman, Santa Fe, NM; Laurence J. Lucas, Attorney, Boise, ID, with her on the brief) for Plaintiffs–Appellees.

James B. Dougherty, Washington, D.C., National Wildlife Federation, Desert Fishes Council, and New Mexico Council of Churches filed an amicus curiae brief for the Plaintiff–Appellees.

Elizabeth Newlin Taylor, Esq., and Jolene L. McCaleb, Esq., of Wolf, Taylor & McCaleb, P.A., Albuquerque, NM, filed an amicus curiae brief on behalf of San Juan Water Commission for the Appellants.

Steven L. Hernandez of Hubert & Hernandez, P.A., Las Cruces, NM, filed an amicus curiae brief on behalf of National Water Resources Association for the Defendants–Intervenors–Appellants.

Paul S. Simmons of Somach, Simmons, & Dunn, Sacramento, CA, filed an amicus curiae brief on behalf of Klamath Water Users Association for the Appellants.

M. Reed Hopper and Anne M. Hayes of Pacific Legal Foundation, Sacramento, CA, filed an amicus curiae brief for the Defendants–Intervenors–Appellants.

Bruce Thompson, City Attorney, Robert D. Kidd, Jr., Assistant City Attorney, Santa Fe, NM; Galen Buller and Germaine R. Chappelle of Montgomery & Andrews, P.A., Santa Fe, NM, City of Santa Fe, and Steven Kopelman, County Attorney, Santa Fe, NM; John W. Utton and J. Brian Smith of Sheehan, Sheehan & Stelzner, P.A., Albuquerque, NM, County of Santa Fe filed an amici curiae brief for the Defendants–Intervenors–Appellants.

Andrew Peternell, Project Attorney, Boulder, CO, filed an amicus curiae brief on behalf of Trout Unlimited for Appellees.

Ken Salazar, Attorney General, Alan Gilbert, Solicitor General, Peter J. Ampe, Assistant Attorney General, Colorado State Attorney General's Office, State of Colorado filed an amicus brief on behalf of Defendants–Intervenors–Appellants.

Alan G. Lance, Attorney General, Clive J. Strong, Deputy Attorney General, Clay R. Smith, Deputy Attorney General, Natural Resources Division, Boise, ID; Don Stenberg, Attorney General, State of Nebraska; W.A. Drew Edmondson, Attorney General, State of Oklahoma; Mark Barnett, Attorney General, State of South Dakota; Hoke MacMillan, Attorney General, State of Wyoming, filed an amici curiae brief for the Appellants.

Michael D. Baird, Esq. of Las Campanas Limited Partnership, Santa Fe, NM; James W. Johnson, Michael J. Pearce and Thomas R. Wilmoth of Fennemore Craig, P.C., Phoenix, AZ, Las Campanas Limited Partnership filed an amicus curiae brief for Appellants.

Michael E. Wall, Attorney, San Francisco, CA, Natural Resources Defense Council, filed an amicus curiae brief.

Before SEYMOUR, PORFILIO and KELLY, Circuit Judges.

JOHN C. PORFILIO, Senior Circuit Judge.

The issue in this appeal is whether the Bureau of Reclamation (BOR) has discretion to reduce deliveries of available water under its contracts with irrigation districts and cities in New Mexico to comply with the Endangered Species Act, 16 U.S.C. §§ 1531–1544(ESA). Roiling beneath this question is an array of interests, many represented here. Each depends on water, "the liquid that descends from the clouds as rain, forms streams, lakes and seas, issues from the ground in springs, and is a major constituent of all living matter," a definition mocked by the 2002 drought. Webster's Third International Dictionary 2591 (3d ed.1993). In a nar-

rowly drawn order addressing carefully limited circumstances, the district court held BOR has discretion to reduce contract deliveries and restrict diversions to meet its duties under the ESA. We agree and affirm that portion of the order that remains before us.

## I. Endangered Species Act

The ESA, enacted in 1973, "represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation" by providing "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978); 16 U.S.C. § 1531(b). Under Section 7, 16 U.S.C. § 1536(a)(2), every federal agency must insure that "any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of the endangered species or threatened species." To do so, every federal agency is required to verify that its actions will not jeopardize any land-based listed species by consulting with, and obtaining the assistance of, the Secretary of Interior, acting through the Fish and Wildlife Service (FWS). 16 U.S.C. § 1536(4). Using "the best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), the agency must determine if any listed species may be present in the area affected by a proposed project and must confer with the Secretary whenever an action is likely to affect such a species. 16 U.S.C. § 1536(a)(3). Upon determining a species is endangered and listing it, the Secretary must designate critical habitat "on the basis of the best scientific and commercial data available," 16 U.S.C. § 1533(b)(1)(A), and "make revisions ... after taking into consideration the econom-

ic impact, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). Section 7, the Supreme Court has stated, "reveals a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Hill*, 437 U.S. at 185, 98 S.Ct. 2279.

Under the regulations accompanying an ESA listing, FWS is required to consult with the affected federal agencies, reviewing "all relevant information," 50 C.F.R. § 402.14(g)(1), to formulate a Biological Opinion (BO), a comprehensive examination of "whether the action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat." 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.02. If the BO concludes "destruction or adverse modification," 50 C.F.R. § 402.14(h)(3), FWS must "include reasonable and prudent alternatives, if any." *Id.* If such a reasonable and prudent alternative (RPA) results in "an incidental taking" which the FWS considers "appropriate," it must issue an Incidental Take Statement (ITS), immunizing the agency from prosecution under Section 9 of the ESA. 16 U.S.C. § 1536(*o*)(2), 50 C.F.R. § 402.14(i).

## II. Parties in this Appeal

In the principal underlying amended complaint, non-profit environmental and conservation organizations, Defenders of Wildlife, Forest Guardians, National Audubon Society, New Mexico Audubon Council, Sierra Club, and Southwestern Environmental Center (Plaintiffs), on behalf of the Rio Grande silvery minnow (Hybognathus amarus) and the Southwestern willow flycatcher (Empisonax trailii extimus),[1]

---

**1.** Both species were named parties in the

original complaint. In its April 19, 2002 or-

sued John W. Keys, III, Commissioner of the United States Bureau of Reclamation (BOR), the United States Army Corps of Engineers (Corps), and the United States Fish and Wildlife Service (FWS) (alternatively, Federal Defendants),[2] for actions alleged to jeopardize the silvery minnow. These federal agencies operate water diversion and storage facilities along the Middle Rio Grande, the New Mexico portion of the Rio Grande which extends from Velarde to the headwaters of the Elephant Butte Reservoir, north of Truth or Consequences, and includes the Rio Chama and Jemez River tributaries. After issuing its first order in that action on April 19, 2002 (*Order I*), the district court allowed intervention by the State of New Mexico (the State), the City of Albuquerque (the City), the Middle Rio Grande Conservancy District (MRGCD), and the Rio Chama Acequia Association (RCAA) (collectively, Intervenors). In their appeals of the court's Order and Partial Final Judgment, Civ. No. 99–1320, September 23, 2002 (*Order II*), now before us under Fed.R.Civ.P. 54(b), numerous parties have submitted amicus curiae briefs.

### III. History of this Litigation

Brinkmanship precipitated either through inadvertence or design best char-acterizes the history of the litigation now before us. Two lines of cases converge here, one targeting the survival of the silvery minnow in its critical habitat under the ESA, the other challenging the impact of that designation on New Mexico's agricultural communities and burgeoning urban centers under the National Environmental Policy Act, 42 U.S.C. § 4321–70d (NEPA), which requires all federal agencies to examine the environmental impact of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Although we only address the issues generated by the ESA action, our analysis resonates with issues raised by the NEPA litigation.

In the ESA litigation, we wrote in 1999, "[i]n 1991, the administrative process was set in motion to list the Rio Grande silvery minnow as an endangered species and designate its critical habitat." *Forest Guardians v. Babbitt,* 174 F.3d 1178, 1181 (10th Cir.1999). Although FWS listed the Rio Grande silvery minnow in 1994, Final Rule, 59 Fed.Reg. at 36988 (July 20, 1994) (to be codified at 50 C.F.R. pt. 17), the Secretary of the Interior did not concurrently designate its critical habitat, 16 U.S.C. § 1533(a)(3)(A),[3] instead agreeing

---

**2.** In its unpublished April 19, 2002 order, the district court found the Corps did not have "sufficient discretion to bring operation of these reservoir facilities under the consultation requirement of the ESA." Environmental plaintiffs have not challenged that ruling. This appeal addresses the issues BOR has raised following the district court's order.

**3.** 16 U.S.C. § 1533(3)(A) states,

der, the district court noted the Southwestern willow flycatcher, listed as an endangered species in 1995, had increased in overall numbers, prompting the parties to address solely the silvery minnow. Absent a contrary indication in these appeals, we similarly confine our discussion to the silvery minnow.

(3) The Secretary, by regulation promulgated in accordance with subsection (b) of this section and to the maximum extent prudent and determinable—
(A) shall, concurrently with making a determination under paragraph (1) that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat; and
Designating critical habitat has the same priority as listing. In *Catron County Bd. of Comm'r v. U.S. Fish and Wildlife Service,* 75 F.3d 1429, 1437 (10th Cir.1996), we explained, "ESA's core purpose is to prevent the extinction of species by preserving and protecting the habitat upon which they depend from the intrusive activities of humans."

to do so by March 1, 1995, a deadline that he later asked to extend until October 1999, because of Congress' 13–month spending moratorium from April 1995 through April 1996. Because the duty to list critical habitat arose before Congress declared the moratorium and remained unfulfilled even two and a half years after the moratorium expired, we held the Secretary violated his non-discretionary duty by failing to publish a final critical habitat designation by March 1, 1995. *Id.* at 1193. Though reluctant to impose the deadline plaintiffs requested, we remanded the case with the instruction the district court order the Secretary to issue the critical habitat designation "as soon as possible, without regard to the Secretary's other priorities under the ESA." *Id.*[4] In July 1999, eight years after the administrative process began, the Secretary designated 163 miles of the main stem of the Rio Grande, from Cochiti Dam to Elephant Butte Reservoir. *See* Final Designation, 64 Fed.Reg. at 36274–01 (July 6, 1999) (to be codified at 50 C.F.R. pt. 17).

This designation triggered a separate lawsuit by some of the parties here, who challenged its impact under NEPA and the ESA. In their consolidated action, MRGCD, the State, and environmental non-profits, Forest Guardians, Defenders of Wildlife, and Southwest Environmental Center, alleged FWS' designation was arbitrary and capricious for failing to adequately consider "to the fullest extent possible," the economic and other relevant impacts under NEPA, 42 U.S.C. § 4332;

and, respectively, to reflect the "best scientific and commercial data available" under the ESA, 16 U.S.C. § 1536(c)(1).

In *Middle Rio Grande Conservancy Dist. v. Babbitt,* 206 F.Supp.2d 1156, 1170 (D.N.M.2000), the district court agreed the designation of the entire 163 miles of the Middle Rio Grande without adequate consideration of "the best scientific data available" or the "economic impact, and any other relevant impact" was invalid. Under ESA scrutiny, the court faulted FWS' failure to support the Final Rule on factual grounds; to scrutinize alternatives to the entire 163 miles of the Middle Rio Grande; "define with sufficient specificity what biological and physical features are essential to the survival of the silvery minnow;" and identify or justify the baseline used to determine impact. *Id.* at 1178–79. On NEPA grounds, the court rejected FWS' submission of a preliminary Environmental Assessment (EA), rather than the more detailed Environmental Impact Statement (EIS).[5] The court stated, "FWS' designation of critical habitat ignores completely the most basic reality of the Rio Grande: it is a fully appropriated river system. Rights to *all* of the river's surface water are legally held for a variety of beneficial uses." *Id.* at 1179 (emphasis in original). Indeed, FWS ignored "the probability of a vast shift in New Mexico's economy, culture, ecology and social life as wholly unremarkable." *Id.* at 1180.

In crafting relief at that time, the district court underscored, the "*urgency of*

---

4. *Center for Biological Diversity v. Norton,* 163 F.Supp.2d 1297, 1300 (D.N.M.2001), also rejected the Secretary's financial predicament and suggested Congress recognize the problems it has created. "Until Congress does, tax dollars will be spent not on protecting species, but on fighting losing battle after losing battle in court." *Id.*

5. In the EA, FWS concluded the critical habitat designation would have no significant impact on the surrounding areas by relying, in part, on a Draft Economic Analysis for 1996, marking "the end of a decade of above normal runoff and several years of significant thunderstorm activity in the Middle Rio Grande Valley." *Middle Rio Grande Conservancy Dist. v. Babbitt,* 206 F.Supp.2d 1156, 1179 (D.N.M.2000).

the situation and the *complexity* of the many interests to be reconciled require Defendants to do more than prepare an Environmental Impact Statement and issue a new final rule. Both the future of the Rio Grande silver [sic] minnow and the Middle Rio Grande Valley stand at imminent risk." *Id.* at 1193 (emphasis added). The court left the designation of critical habitat in place, however, while ordering FWS to issue a new rule to take effect within 120 days, ordered the Secretary to prepare an EIS, and urged his federal representatives to "fully and earnestly participate in mediation now being conducted" in a parallel action. *Id.* at 1193.

Although FWS proposed a new critical habitat designation on June 6, 2002, *see* Designation of Critical Habitat for the Rio Grande Silvery minnow, 67 Fed.Reg. 39206 (June 6, 2002) (to be codified at 50 C.F.R. pt. 17), the Secretary did not conduct an EIS, instead, appealing that portion of the court's injunction to allow FWS to reconsider whether an EIS was necessary. In *Middle Rio Grande Conservancy Dist. v. Norton,* 294 F.3d 1220, 1225 (10th Cir. 2002), we rejected this argument, recalling that "FWS' compliance with NEPA and the ESA has been marked by massive delays and inadequate decision-making," which fully exacerbated the status of the Rio Grande silvery minnow. *Id.* at 1226. "These delays and irrational decisions come at the expense of the Silvery Minnow, officially endangered for nearly eight years. As FWS recognizes, damming, channelization, and the introduction of nonnative predatory fish have decimated the Silvery Minnow population [which] currently occupies only five percent of its historic range." *Id.* We agreed that prep-

aration of an EIS was essential given the "overwhelming evidence that the designation will significantly affect the quality of the human environment ... [and] require pervasive changes in the distribution of Middle Rio Grande riverwater resulting in the reduction of irrigated agriculture acreage." *Id.* at 1227.

What "significantly" affects impact under NEPA includes a determination of "the degree to which the effect ... will be 'highly controversial.'" *Id.* at 1229; 40 C.F.R. § 1508.27(b)(4). Because the record fully established "the effects of water reallocation and curtailment of river maintenance are significant" and "controversial," *id.* at 1229, we instructed FWS and the federal agencies, especially BOR, responsible for managing and operating the dams, reservoirs and other projects slicing this span of the Middle Rio Grande, to insure "any action" proposed is "not likely to jeopardize the continued existence of any endangered species," 16 U.S.C. § 1536(a)(2), a duty, we warned, which might require reallocating the already fully appropriated waters of the Rio Grande. *Id.* at 1230.

In the meantime, in April 2000, Plaintiffs, here, sought a preliminary injunction to compel BOR and the Corps to initiate consultations with FWS to implement their discretionary alternatives to maintain sufficient flows in the Middle Rio Grande to avoid jeopardy to the silvery minnow based on FWS' initial studies.[6] On July 6, 2000, FWS initiated formal consultation with BOR and the Corps. Their consultations produced a final BO, on June 29, 2001, which found BOR's proposed actions in operating the federal water projects on the Middle Rio Grande would result in

---

**6.** In response, the court ordered mediation, and the parties negotiated an interim Agreed Order in which the City of Albuquerque, MRGCD, BOR, and the Corps released addi-

tional water to maintain a continuous flow in the Upper San Acacia reach from October 1 through October 31, 2000.

jeopardy to the silvery minnow. Plaintiffs then filed a second amended complaint adding Federal Defendants, FWS, the Secretary of the Interior, and the United States seeking review of the June 29, 2001 BO under the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.* (APA), and alleging FWS violated the APA by issuing the BO without a reasonable and prudent alternative and failing to use the best scientific data as required by the ESA. Additionally, Plaintiffs alleged BOR and the Corps violated the ESA's procedural and substantive requirements by failing to consult fully with FWS over all their discretionary actions and by causing jeopardy and an unlawful taking of the silvery minnows under Section 7(a)(1) and Section 9 the ESA's substantive provisions.

In *Order I,* the district court upheld the June 29, 2002 BO after a comprehensive review of the ESA's procedural and substantive provisions and the plight of the Rio Grande silvery minnow. In its APA review, the court found the reasonable and prudent alternative, though permitting some intermittent drying of the river in the San Acacia reach, was not arbitrary and capricious. On Plaintiffs' consultation claim alleging BOR and the Corps have a duty to protect the silvery minnow more broadly, respectively, by limiting water deliveries under the Middle Rio Grande Project (MRGP) and the San Juan–Chama Project (SJCP) and altering the normal operations of Middle Rio Grande reservoir facilities, the court held, "BOR retains sufficient discretion over its river management and operations in the middle Rio Grande, specifically water deliveries under the Middle Rio Grande Project and under the San Juan–Chama Project, to require BOR to consult over those actions under Section 7(a)(2) of the ESA." That conclusion derived from the ESA definition of "agency action," which broadly embraced "*any* action authorized, funded, or carried out by such agency." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02 (emphasis added). In resolving this "more hotly contested issue, federal agency discretion," the court looked both to the authorizing statute, the Reclamation Act, 43 U.S.C. § 372, the contracts governing BOR's allocations of water, and case law, in particular a trio of Ninth Circuit cases. Although the court found procedural violations of the consultation requirement in FWS' failure to expand the scope of consultation in a meaningful way by relying on BOR's own interpretation of its discretion, it credited FWS' "interim solution to avoid jeopardy in coordination with all the major players in the middle Rio Grande basin." *Order I* at 44. This solution, it remarked, was achieved after "unprecedented attempts to come to grips with all the competing interests for a very limited water supply in the middle Rio Grande basin." *Id.* Recognizing the circumstances were "complex, difficult to resolve, and *evolving,*" the district court applauded the Federal Defendants for protecting the silvery minnow "without altering water deliveries to federal contractors." *Id.* at 44 (emphasis added).[7]

---

7. In an unpublished order, *Rio Grande Silvery Minnow v. Keys, III,* 46 Fed.Appx. 929 (10th Cir.2002), we dismissed Federal Defendants' appeal of this order for lack of interlocutory appellate jurisdiction and denied a motion for stay as moot. Further, we held that intervenors, the same parties here, who alleged the order had adverse consequences for their interests in Rio Grande water could show no injury in fact and, thus, lacked standing. The court's order requiring federal defendants to "*consider* use of intervenors' water when they consult caused no 'concrete injury.'" *Id.* 932. "[U]nless and until consultation actually results in a decision to use their water—which may never happen—any 'injury in fact' to their interests attributable to the district

Five months later, piqued by BOR's failure to reinitiate consultations while delivering "nearly all" contracted water despite the severe drought in 2002, the district court chastised the Federal Defendants for asking it to uphold a jeopardy determination with no reasonable and prudent alternative. *Order II* at 2. Because only the Endangered Species Committee, popularly styled the "God Squad" under an amendment to the ESA, 16 U.S.C. § 1536(e),[8] may grant the exemption the Federal Defendants sought, the district court proceeded to address the substantive ESA issues raised by FWS' September 12, 2002 BO. The court found the best scientific data available consistently indicated the San Acacia reach of the Middle Rio Grande provided the surest possibility for the silvery minnow's survival. Nonetheless, the BO proposed targeting flows to the Albuquerque reach where the Silvery Minnow was already scarce. The court, thus, held the BO was arbitrary and capricious under the ESA's jeopardy and take provisions.[9] The court recognized delivering the same amount of contract water in 2003 would assure the Federal Defendants could not even meet the flow requirements set in the June 29, 2001 BO.

Tipping the balance of hardships and public interest in favor of the protected species, as required by *Hill*, the court granted preliminary injunctive relief to Plaintiffs on their jeopardy, failure to conserve, and take claims. It further relieved BOR from compliance with the June 29, 2001 flow requirements; required BOR to (1) provide sufficient flows for the remainder of 2002, releasing water from "Heron Reservoir in 2002," if necessary to meet the 50 cfs flow in the San Acacia reach, (2) comply with the conservation recommendations in the BO of June 29, 2001 and September 12, 2002, (3) reinitiate consultation to plan for "contingencies that may arise during the rest of 2002 and during 2003 based on the different amounts of water that may be available in the Rio Grande basin," and (4) beginning in January 1, 2003, comply with flow requirements in "the June 29, 2001 Biological Opinion until a new Biological Opinion is issued that contains a Reasonable and Prudent Alternative that avoids jeopardy, if possible." *Order II* at 3. Finally, the court wrote in Paragraph 14:

If necessary to meet flow requirements in 2003, either under the June 29, 2001 Biological Opinion or under a new Biological Opinion resulting from reinitiation of consultation, the Bureau of Reclamation must reduce contract deliveries under the San Juan–Chama Project and/or the Middle Rio Grande Project, and/or must restrict diversions by Middle Rio Grande Conservancy District un-

---

court's order" is entirely conjectural and inadequate to confer standing. *Id.*

8. 16 U.S.C. § 1536(e) provides:

(e) Endangered Species Committee

(1) There is established a committee to be known as the Endangered Species Committee (hereinafter in this section referred to as the "Committee").

(2) The Committee shall review any application submitted to it pursuant to this section and determine in accordance with subsection (h) of this section whether or not to grant an exemption from the require-

ments of subsection (a)(2) of this section for the action set forth in such application.

9. In finding the BO arbitrary and capricious, the court also faulted BOR for taking no water from the Heron Reservoir in order to fully meet its SJC Project and MRGCD water deliveries; crediting "unspecified weather predictions of long-term drought for 10–15 years ('BOR gives the benefit of doubt to dire drought prediction, not the Silvery Minnow'"); and assuming the silvery minnow's survival only through artificial means despite the best scientific data to the contrary. *Order II* at 20.

der the Middle Rio Grande Project, consistent with the Bureau of Reclamation's legal authority as determined in the Court's April 19, 2002 Memorandum Opinion and Order.

(¶ 14) *Order II* at 3.

## IV. Jurisdiction

Despite this protracted and elaborate prelude, the district court's facilitating our review under Fed.R.Civ.P. 54(b), and the parties' assertion of jurisdiction under 28 U.S.C. § 1291, we are constrained to question whether the water level in the Rio Grande makes the issue before us justiciable. That is, under ¶ 14,[10] the contingency of how much water is flowing through the main stem of the Rio Grande and whether that amount satisfies the flow requirements for 2003, set either by the June 29, 2001 BO or a new BO,[11] appears to erode our power to decide the issue certified for review. Does this case present an actual case or controversy, ripe for review, or are we, in fact, being asked for an advisory opinion? "The case or controversy ·requirement of Article III admonishes federal courts to avoid 'premature adjudication' and to abstain from 'entangling themselves in abstract disagreements.'" *U.S. West, Inc. v. Tristani,* 182 F.3d 1202, 1208 (10th Cir.1999), *quoting Keyes v. Sch. Dist. No. 1, Denver, Colo.,* 119 F.3d 1437, 1443 (10th Cir.1997). Although Plaintiffs questioned whether this case is ripe for review while Federal Defendants and Intervenors urge a decision on the merits, we must first assure our jurisdiction. *Prairie Band of*

*Potawatomi Indians v. Pierce,* 253 F.3d 1234–1240 (10th Cir.2001).

■ Ripeness is "peculiarly a question of timing." *Reg'l Rail Reorganization Act Cases,* 419 U.S. 102, 140, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). While a focus on whether the issue is ripe for review is sufficient to support standing, ripeness asks whether, in fact, there "yet is any need for the court to act." 13A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3532.1, p. 130 (1984). "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated or indeed may not occur at all.'" *Texas v. United States,* 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998), *quoting Thomas v. Union Carbide Agric. Prod. Co.,* 473 U.S. 568, 580–81, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) (internal quotations omitted).

To decide whether to act under these uncertainties, courts take a functional approach, balancing the need for decision against the risks of decision. *See New Mexicans for Bill Richardson v. Gonzales,* 64 F.3d 1495, 1499 (10th Cir.1995) ("The doctrine of ripeness is intended to forestall judicial determination of disputes until the controversy is presented in clear-cut and concrete form."). The need side of the equation includes "the importance attached to the interests that may be injured, the extent of the anticipated injury, and the probability that the injury will occur." 13A C. Wright, A. Miller, & E. Cooper,

---

**10.** ¶ 14 remains the only justiciable issue before us, the cooler and wetter fall of 2002 having permitted BOR to meet the June 29, 2001 flow requirements for the remainder of 2002 as ordered by the district court. Moreover, on October 16, 2001, we granted a request for stay of the district court's order and expedited consideration of these appeals.

**11.** FWS and BOR notified the court of their intention to issue a new BO on March 10, 2003, extended to March 17, 2003, addressing "the effects of the Bureau of Reclamation's water and river maintenance operations, the Army Corps of Engineers' flood control operation, and related non-federal actions on the Middle Rio Grande in New Mexico." Until its completion, the June 2001 BO remains in effect.

Federal Practice and Procedure § 3532.2, p. 146. The risks of deciding may include "the relationships of the federal judiciary with other branches of the federal government and with state institutions, the need to conserve judicial resources, and the risk that premature decision may be proved unwise as facts are more fully developed." *Id.* at 147. This equation may be expressed in terms of the "fitness of the issues for judicial decision and the hardship to the parties of withholding court considerations." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

■ Applying these factors to the case before us, we believe the balance tips in favor of appellate review. The importance of the interests at stake—the preservation of an endangered species, which "admits of no exception," *Hill,* 437 U.S. at 173, and the federal agencies' obligation to fulfil existing water contracts as well as the extent of the injury, extinction of the silvery minnow if the drought persists, unless available water is allocated, and the potential harm to water users—outweigh the risk of a premature decision. As detailed here, the factual record has been accumulated over the last twelve years. The only "facts" left to develop depend on snow pack and rain, uncertain future events whose effect will be better understood once the legal issue, presently fully developed and concrete, is resolved. "The issue presented in this case is purely legal, and will not be clarified by further factual development." *Thomas v. Union Carbide Agr. Products Co.,* 473 U.S. 568, 581, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985).

Importantly, resolution of the purely legal question at the heart of this appeal may permit the parties to fully address the array of long-term planning and water management issues which lurk beneath the surface of each of the issues presented here. "Rather than asking, negatively, whether denying relief would impose hardship, courts will do well to ask, in a more positive vein, whether granting relief would serve a useful purpose, or, put another way, whether the sought-after declaration would be of practical assistance in setting the underlying controversy to rest." *State of R.I. v. Narragansett Indian Tribe,* 19 F.3d 685, 693 (1st Cir.1994) (ripeness analysis under the Declaratory Judgment Act). Indeed, if the Federal Defendants have, in fact, reinitiated broader consultation, certainty about their discretion to reallocate water under the contracts would permit a fuller evaluation of the solutions each party seeks.

Moreover, if we dismiss this case on the basis of ripeness, we essentially wipe the slate clean leaving the parties to develop the merits anew. We, therefore, must tip the balance to conserve the already vast investment of judicial and executive agency resources. Under all of these circumstances, "delay means hardship." *Shalala v. Ill. Council on Long Term Care,* 529 U.S. 1, 12, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000).

## V. Authorizing Legislation and the Contracts

■ Although Plaintiffs filed the underlying action to prevent jeopardy by drying portions of the Rio Grande determined to be the critical habitat of the silvery minnow, the heart of this case devolves to the interpretation of contracts authorized by several statutes enacted to address river aggradation and flood and sediment control in the Colorado River Basin and Middle Rio Grande Valley. With the entire case before us in this interlocutory appeal, and the record fully developed, we review the contracts, statutes, and regulations de novo. *Sierra Club v. Marsh,* 816 F.2d

1376, 1382 (9th Cir.1987) (citations omitted).

### A. The San Juan–Chama Project

Two acts of Congress authorizing the two major water projects in the Middle Rio Grande overarch this action. In 1962, Congress enacted the San Juan Chama–Reclamation Project Act of June 13, 1962, Pub.L. No. 87–483 (76 Stat. 96) (SJCP Act), under the Colorado River Storage Project Act of April 11, 1956, 43 U.S.C. § 620.[12] Section 620g of the Colorado River Storage Project Act directed the Secretary of the Interior:

> to investigate, plan, construct, operate, and maintain (1) public recreational facilities on lands withdrawn or acquired for the development of said project or of said participating projects, to conserve the scenery, the natural, historic, and archeologic objects, and the *wildlife on said lands,* and to provide for public use and enjoyment of the same and of the water areas created by these projects by such means as are consistent with the primary purposes of said projects; and (2) facilities *to mitigate losses of, and improve conditions for, the propagation of fish and wildlife.*

43 U.S.C. § 620g (emphasis added). As anticipated by 43 U.S.C. § 620, which crafted the initial stage of the San Juan–

Chama Project in 1956, the SJCP Act of 1962 directed the Secretary:

> to construct, operate, and maintain the initial stage of the San Juan–Chama project, Colorado–New Mexico, for the principal purposes of furnishing water supplies ... in the Rio Grande Basin and ... in the existing Middle Rio Grande Conservancy District and for municipal, domestic, and industrial uses, and providing recreation and fish and wildlife benefits.

Act of June 13, 1962, Pub.L. No. 87–483 (76 Stat. 96).

The legislation authorized construction of "diversion dams and conduits, storage and regulation facilities at the Heron Numbered 4 Reservoir site,"[13] the principal storage facility at issue here, and enlarging the already existing El Vado Dam. Congress charged the Secretary with operating the SJC Project "so that for the preservation of fish and aquatic life, the flow of the Navajo and Rio Blanco Rivers," involved in the earlier project "shall not be depleted" below levels set in a 1955 BOR Report entitled, San Juan–Chama Project, Colorado–New Mexico. Section 8(f), Pub.L. No. 87–483 (76 Stat. 96). The 1962 SJCP Act capped Rio Grande diversions at 1,350,000 acre-feet (a.f.) of water for ten years and required the Secretary to operate the project under the terms of the

---

**12.** The Colorado River Storage Project Act of April 11, 1956, 43 U.S.C. § 620, authorized the Secretary of the Interior to construct, operate, and maintain the Navajo Dam and Reservoir on the Middle Rio Grande "to initiate the comprehensive development of the water resources of the Upper Colorado River Basin, for the purposes, among others, of regulating the flow of the Colorado River, storing water for beneficial consumptive use, making it possible for the States of the upper Basin to utilize, consistently with the provisions of the Colorado River Compact, the apportionments · made to and among them...." 43 U.S.C. § 620. New Mexico,

one of four states in the Upper Colorado River Basin, was a signatory to the Colorado River Compact of 1922 under which this statute was authorized.

**13.** Only imported SJC Project water may be stored in Heron Reservoir. All native water is released to the river below Heron Dam and "is effectively bypassed through Heron Reservoir on a regular basis." Programmatic Biological Assessment of Reclamation's Discretionary Actions Related to Water Management on the Middle Rio Grande, New Mexico, January 2001.

Upper Colorado River Basin Compact,[14] consulting with the several river commissions and appropriate agencies of the United States, Colorado, New Mexico, Texas, and other project entities. Section 8(e), Pub.L. No. 87–483 (76 Stat. 96).

As envisioned, the SJC Project created a trans basin diversion from the Colorado River Basin to the Rio Grande Basin, taking water from the upper tributaries of the San Juan River, a tributary of the Colorado River, and transporting it through a tunnel under the Continental Divide to the Rio Chama, a major tributary of the Rio Grande. BOR stores the water in Heron Reservoir. Below Heron Reservoir on the Rio Chama is El Vado Reservoir.

### 1. BOR–SJC Project Contracts

Under this congressional authorization, the Secretary of the Interior, pursuant to the Federal Reclamation Laws, including the 1956 Colorado River Storage Act and 1962 SJCP Act, "*all as amended or supplemented,*" entered into a basic contract with the City of Albuquerque (City) on June 25, 1963, "for furnishing water for municipal, domestic, and industrial uses, and for other beneficial purposes; for the purpose of obtaining, securing, and supplementing its water supply . . . for municipal

purposes." (1963 Repayment Contract) (emphasis added).[15] The 1963 Repayment Contract was based on the initial stage of the SJC Project,[16] which promised to furnish an average of about 101,800 a.f.[17] of project water, defined as "water available for use through the project works," at the outlet of the Heron Dam for diversion of the natural flows of the Rio Blanco, Little Navajo and Navajo Rivers; regulation and storage facilities at Heron Reservoir and enlargement of the existing El Vado Dam on the Rio Chama; and water use:

> To provide the City of Albuquerque with additional water for municipal purposes; to provide supplemental water for irrigation of irrigable land in the Middle Rio Grande Conservancy District; to replace depletions in the Rio Grande Basin; and reservoirs, dams, canals, laterals, and drainage for furnishing a firm water supply to the land in the Cerro, Taos, Llano, and Pojoaque tributary irrigation units.

In return, the City agreed to repay the costs incurred by the United States for constructing the reservoir complex. The contract listed the repayment schedule in annual installments. Those sums, however, did not include "that portion of the

**14.** The Colorado River Compact of 1922 divided the Colorado River among seven states vying for its water. The Compact bisected the Colorado River into two basins, Colorado River Compact, Art. I, the states of the Upper Basin, Wyoming, Colorado, Utah, and New Mexico, which "naturally drain into the Colorado River System," Art. II(f)(g), and those of the Lower Basin, California, Nevada, and Arizona. Sharon P. Gross, *The Galloway Project and the Colorado River Compacts,* 25 Nat. Resources J. 935, 938 (1985).

**15.** The contract also incorporated the Reclamation Act of June 17, 1902, 43 U.S.C. § 372, which provides:

> Water right as appurtenant to land and extent of right

> The right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right.

**16.** The contract defines the term, project, "shall mean the initial stage of the San Juan–Chama Project, Colorado–New Mexico, as authorized by the Act of Congress dated June 13, 1962 (76 Stat. 96)."

**17.** In 1989, BOR reduced the Firm Yield from Heron Reservoir to 96,200 a.f./yr. An acre foot is the volume of water that would cover one acre to a depth of one foot.

annual operation and maintenance cost allocated to the fish and wildlife function." 1963 Repayment Contract, § 7b.[18] The contract provided that title to all project works and facilities "shall remain in the United States until otherwise provided by Congress." § 12.

Under "WATER RIGHTS—WATER SUPPLY GENERAL," the 1963 Repayment Contract included a limitation for water shortages (Water Shortage Clause):

> On account of drouth or *other causes,* there may occur at times during any year a shortage in the quantity of water available from the reservoir storage complex for use by the City pursuant to this contract. In no event shall any liability accrue against the United States or any of its officers or employees for any damage, direct or indirect, arising out of any such shortage.

§ 18b (emphasis added). The 1963 Repayment Contract gave the City "the exclusive right to use and dispose of that share of the project water supply available and allocated to municipal water supply purposes. Such use or disposal may be by diverting and applying such water directly from the Rio Grande stream system," offsetting underground water withdrawals with project water. § 18d. "[U]pon completion of repayment of that portion of the City's water supply costs ..., the City shall have a permanent right to the use of that portion of the project water supply allocated to its use herein." § 18d. A subsection entitled, "Other Uses," provided,

The project is authorized for furnishing water for irrigation and municipal uses [19] and for providing recreation and fish and wildlife benefits, and for other beneficial purposes.

§ 18h. The annual allotment of 101,800 a.f. of project water, "available water" was qualified,

> During periods of scarcity when the actual available water supply may be less than the estimated firm yield, the City shall share in the available water supply in the ratio that allocations above bear to the estimated firm yield.

1963 Repayment Contract § 18j. When costs are totally reimbursed, the City secured a "vested right to renew said contract indefinitely ... so long as a water supply may be available and the City is current on its payments for water service." 1963 Repayment Contract § 26.

An amendatory contract, executed on July 6, 1965, authorized by a subsequent Act of Congress of March 26, 1964, authorized the Secretary "to make water available for a permanent pool for fish and wildlife and recreation purposes at Cochiti Reservoir from the San Juan–Chama Project." The court's decision in *Jicarilla Apache Tribe v. United States,* 657 F.2d 1126, 1133 (10th Cir.1981), prompted the amendment. Under this contract, the City agreed to release a portion of its San Juan–Chama Project water for the Cochiti Reservoir.

Subsequent contracts between BOR and other New Mexico cities, towns, and water districts incorporated the essential terms

---

**18.** A condition precedent of this contract stated:

> § 9b
> *Other Repayment Contracts.* The United States shall not be required to initiate construction until the Middle Rio Grande Conservancy District shall have executed a contract satisfactory to the Contracting Officer

covering a share of the costs of the reservoir storage complex.

**19.** The City contract has no comma after "uses." In contrast, MRGDC's amendatory repayment contract for SJC Project water has a comma after "uses" in the same clause. Our interpretation of the contract is not altered by the difference.

of Albuquerque's 1963 Repayment Contract, including the water shortage and available water clauses. Later contracts, for example, a 1990 contract between BOR and the town of Red River, New Mexico, contained additional provisions for compliance with NEPA and Title VI of the Civil Rights Act of 1964. The 1992 contract between the Secretary and the Jicarilla Apache Tribe for delivery of Navajo Reservoir Supply water from the SJC Project works at Heron Reservoir and the Tribe's diverting water from the Navajo River on the Reservation provided for cooperation among the parties, including FWS, BOR, and the Bureau of Indian Affairs, in planning and construction projects, "as required by federal law, including, but not limited to, the Bald and Golden Eagle Protection Act, the Fish and Wildlife Coordination Act, the Endangered Species Act, the Clean Water Act, and the National Environmental Policy Act."

## B. The Middle Rio Grande Project

Congress approved the Middle Rio Grande Project (MRGP) under the Flood Control Acts of 1948 and 1950, 33 U.S.C. §§ 701s, 701f–2, respectively, for flood control and reclamation.[20] Besides improving and stabilizing the economy of the Middle Rio Grande Valley, the proposal sought to rescue and rehabilitate the Middle Rio Grande Conservancy District (MRGCD), organized with private capital in 1925 as a political subdivision of the State, but floundering by the late 1940s because of its "originally unsound basis of assessment of benefits." A Plan for Development of the Middle Rio Grande Project, New Mexico, Report on the Potential Project Plan, drafted by the BOR, August 30, 1947 (MRGP Plan). To that end, the United States agreed to acquire the MRGCD's

obligations and cancel all indebtedness in exchange for MRGCD's conveying and assigning "all of its property rights, including reservoirs, canals, dams, and flood-control works, together with its water rights, and including title and ownership thereto ... such property so conveyed to the United States shall be so held until Congress otherwise directs." MRGP Plan. The MRGP Plan included "fish and wildlife features" and further provided:

> In general, any contract between the district and the United States should be in pursuance of the Federal reclamation laws as modified by specific direction of the Congress in pursuance of the provisions of section 9(a) of the Reclamation Project Act of 1939 [43 U.S.C. § 485].

Envisioned as a comprehensive scheme developed through "coordinated studies by the Bureau of Reclamation and the Corps of Engineers," the MRGP Plan designated BOR responsible for the El Vado Reservoir improvements, Rio Grande channel rectification operations, irrigation and project rehabilitation work, and drainage rehabilitation and extension work; and designated the Corps for construction of three dams and reservoirs, as well as levees for local flood protection. Middle Rio Grande Project, Letter from the Bureau of the Budget to the Secretary of the Interior, April 12, 1949. The MRGP Plan indicated that "[a]dditional development of fish and wildlife values, and recreation facilities is needed through the Middle Rio Grande Valley to satisfy the increasing demand by the large number of out-of-state visitors, together with the local demand for such facilities." The proposal allocated $670,109 for recreation, fish and wildlife, and geological survey programs, considered to be non-reimbursable and as a part

---

**20.** 33 U.S.C. §§ 701s and 701f–2 authorized appropriated funds to specific projects for

flood control as Congress broadly declared in 33 U.S.C. § 701a.

of the reservoir and channelization development.

### 1. MRGCD Contract

The September 24, 1951 contract between the United States and the MRGCD, written under the Reclamation Acts of 1902, 1948, and 1950 (1951 Repayment Contract), "and acts amendatory thereof and supplementary thereto," incorporated a "comprehensive plan for the control of the Rio Grande" as detailed in the 1947 BOR Project Report. Central to its terms was the transfer of title to all MRGCD works, defined as:

> those structures, reservoirs, ditches and canals now constructed and operated by the District and those to be constructed or rehabilitated under the terms of this contract for the storage, diversion and distribution of water for use in the District, and the drainage of lands, together with rights of way therefor and for operation thereof.

§ 8. The United States agreed to construct, rehabilitate, operate, and maintain the MRGC Project works in exchange for MRGCD's payment of reimbursable construction, operation, and maintenance costs. The contract included a clause barring liability for water shortages:

> Should there ever occur a shortage in the quantity of water which normally would be available through and by means of said project works constructed in connection therewith, in no event shall any liability accrue therefor against the United States, or any of its officers, agents, or employees for any damage direct or indirect arising therefrom and the payments to the United States provided for herein shall not be reduced

because of any such claimed shortage or damage.

1953 Repayment Contract § 23. MRGCD agreed to assign its water filings in the El Vado Reservoir to the United States to be held "primarily for domestic, irrigation and municipal use" and "reserved to the United States ... seepage and return flows." § 28. Further, the MRGCD "may ... contract for the disposal of a part of the project water supply for any use not detrimental to the primary uses herein specified." *Id.*

The 1951 Repayment Contract provided that "[t]itle to all works constructed by the United States under this contract [is] vested in ... the United States until otherwise provided for by Congress, notwithstanding the transfer hereafter of any such works to the District for operation and maintenance." § 29. Throughout, the contract preserved the status of Indian lands and water rights within the MRGCD.

Under the 1951 Repayment Contract, MRGCD granted all necessary easements to the works and structures of the MRGCD to the United States. In May 1963, "in consideration of the privileges derived from the repayment contract," MRGCD conveyed to the United States and assigned its "rights, titles and interests in and to water rights" described in Permit No. 1690,[21] including "upwards of 1,872,000 a.f." whose source was the Rio Grande, Rio Chama, and other tributaries, for "irrigation, power, and other beneficial uses."

Subsequently amended in 1953, 1955, and 1956, these MRGCD Repayment Contracts were again amended on June 25, 1963, after enactment of the SJCP Act, to

---

**21.** File No. 1690 attached to the contract "is a permit to construct El Vado Dam and impound and maintain therein a maximum of 198,110 acre-feet of water for flood control and supplementing the rights of the Middle Rio Grande Conservancy District with water for 123,267 acres."

secure a supplemental supply of water from SJC Project water. Incorporating many of the terms in BOR–SJC Project contracts, this amendatory contract added the provisions allocating fish and wildlife costs to the United States unless "unusual circumstances" arose to "throw the allocation out of balance;" the Water Shortage Clause ("[o]n account of drouth and other causes"); the other uses clause authorizing project water "for irrigation and municipal uses, and providing recreation and fish and wildlife benefits."

As a consequence of the contracts derived from these legislative authorizations, virtually all available SJC Project water is appropriated. MRGCD, as agent of the United States, operates all Project works except El Vado Dam, which BOR operates.

## VI. BOR's Discretion to Allocate Water Under the Contracts to Comply with § 7 of the ESA–02–2034.

BOR contends the Repayment Contracts [22] define their obligations under the ESA. Because the contracts do not expressly permit a reduction in deliveries of project water below their fixed amounts, BOR maintains it lacks discretion to comply with the ESA. BOR tethers this argument to 50 C.F.R. § 402.03, which states, "Section 7 and the requirements of this Part apply to all actions in which there is discretionary Federal involvement or control." Consequently, BOR lacks authority under the ESA to short its negotiated water contracts. Under this view, the Water Shortage Clause "on account of drouth or other causes," applies only to circumstances in which it is "impossible" to deliver the fixed contractual water, not to situations in which it *creates* the shortage for purposes of complying with the ESA. BOR

contends the latter action clearly expands its existing authority, a proposition rejected by *Am. Forest and Paper Ass'n v. U.S. E.P.A.*, 137 F.3d 291, 299 (5th Cir.1998) ("the ESA serves not as a font of new authority, but as something far more modest: a directive to agencies to channel their *existing* authority in a particular direction"); *Platte River Whooping Crane Trust v. Fed. Energy Regulatory Comm'n*, 962 F.2d 27, 34 (D.C.Cir.1992).

BOR relies on *Sierra Club v. Babbitt*, 65 F.3d 1502 (9th Cir.1995), both to support this argument and to contrast the contrary conclusions reached in *O'Neill v. United States*, 50 F.3d 677 (9th Cir.1995); *Natural Res. Def. Council v. Houston*, 146 F.3d 1118 (9th Cir.1998); and *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206 (9th Cir.1999). In *Sierra Club*, environmental plaintiffs sued the Secretary of the Interior to enjoin the construction of a logging road alleged to adversely impact the Northern spotted owl. 65 F.3d at 1502. The Ninth Circuit affirmed the denial of injunctive relief upon accepting the opinion of the Regional Solicitor for the Bureau of Land Management that there was no discretionary federal action to which section 7(a)(2) could apply, "based on the three specific limitations of the right-of-way agreement, the regulations, and the statute." *Id.* at 1509–10. Under those specific circumstances, the court held, "Congress did not intend for section 7 to apply to an agreement finalized before passage of the ESA where the federal agency currently lacks the discretion to influence private activity for the benefit of the protected species." *Id.* at 1511–12. Here, too, BOR asserts it retained no discretion "to change or ignore its contractual commitments" through ESA fiat expand-

---

**22.** Because both the SJC Project and the amended MRGCD contracts incorporate similar repayment schemes and terms, we refer to the contracts at issue as Repayment Contracts.

ing its authority. *See also Envtl. Protection Info. Center v. Simpson Timber Co.,* 255 F.3d 1073, (9th Cir.2001) (take permit for Northern spotted owl did not reserve discretion for FSW to act to protect Coho salmon and marbled mullet later listed as protected species).

Moreover, BOR contends because the MRGP Act did not mention the use of water for fish and wildlife and the SJC Project Plan expressly excluded this use in a later report,[23] using the already contractually committed water is not "consistent with the scope of the Federal agency's legal authority" to constitute a reasonable and prudent alternative under the ESA. 50 C.F.R. § 402.02. A reasonable and prudent alternative must be within the agency's authority, BOR insists; otherwise, it is an unreasonable expansion of agency authority under the ESA.

BOR distinguishes *O'Neill, Houston,* and *Klamath,* on the ground that subsequently enacted legislation, the Central Valley Project Improvement Act (CVPIA), expressly allocated project water for fish and wildlife. Thus, BOR maintains, the absence of similar, specific legislation here undermines their precedential value. Although BOR concedes, the "other causes" clause in *O'Neill* is virtually identical to the clause here and might also well refer to subsequent enactments of Congress like the ESA,[24] no specific later congressional act expressly altered its fixed contractual

commitments. Under that circumstance, BOR contends *O'Neill* and its progeny did not reach the question whether the ESA imposes a mandatory duty to devote irrigation water to avoid jeopardy of an endangered species. Thus, BOR contends the precise issue before us is whether the shortage clause alone gives it discretion to reduce contract deliveries of project water to comply with the ESA.

We would not channel the inquiry so narrowly, particularly because its predicate is that BOR's ESA obligations are fixed solely by the Repayment Contracts. Under the ESA and its regulations,

> Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies.... Examples include, but are not limited to:
>
> . . .
>
> (c) the granting of licenses, contracts, leases.

50 C.F.R. § 402.02. We fully agree BOR's negotiating and executing these contracts is "agency action." *Houston,* 146 F.3d at 1126. Hence, the breadth of this plain language surely places the burden on BOR to show how, in carrying out the mandates of the reclamation laws through the Repayment Contracts, BOR intended to limit Congress' sovereign authority to enact subsequent legislation that figures into the interpretation of these contracts.[25] The

---

**23.** In support, the Federal Defendants quote a portion of the Report which provides no support for this broad statement in the face of the express statutory language.

**24.** Indeed, in *O'Neill v. United States,* 50 F.3d 677 (9th Cir.1995), BOR argued " 'on account of errors in operation, drought, or any other causes' ... is broad and unambiguous and that shortages stemming from mandatory compliance with ESA and CVPIA are shortages resulting from 'any other cause.' " *Id.* at 682–83.

**25.** It also activates scrutiny under the doctrine of unmistakable terms, which broadly states, "[c]ontractual arrangements remain subject to subsequent legislation of the presiding sovereign." *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 147, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982). *United States v. Winstar Corp.,* 518 U.S. 839, 878, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), summarized the collective holding on unmistakability:

> that a contract with a sovereign government will not be read to include an unstated term exempting the other contracting

question before us, then, is whether the Repayment Contracts, a watershed of numerous congressional authorizations, reserve discretion for BOR to comply with the ESA.

■ "Federal law controls the interpretation of a contract entered pursuant to federal law when the United States is a party." *United States v. Seckinger*, 397 U.S. 203, 209–10, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970); *Howard v. Group Hosp. Serv.*, 739 F.2d 1508, 1510–11 (10th Cir.1984) (federal law controls when outcome of suit has direct effect on the United States). The Repayment Contracts expressly rooted their authorization in the federal reclamation laws, "all as amended or supplemented."

■ Looked at as a whole, the Repayment Contracts established a specific repayment schedule for a calendar year, § 7a, and specified that although 5.6 % of the annual operation and maintenance costs are attributed to fish and wildlife, BOR alone would be obligated to pay those costs. § 7b. BOR expressly limited its liability in case of drought "or other causes" which might affect "the quantity of water *available* from the reservoir storage complex." § 18b (emphasis added). The contracts recognized exchanges in project water for water from aquifers and the Rio Grande stream system, native water, § 18d, and that during periods of scarcity, when the "actual available water supply" is less than "firm yield," the non-federal parties will share in that available water. § 18j. Importantly, the Repayment Contracts expressly included providing water for fish and wildlife as a beneficial use.[26] These clauses, taken together, establish that BOR retained the discretion to determine the "available water" from which allocations would be made, allotments which, in times of scarcity, might be altered for "other causes," the prevention of jeopardy to an endangered species. The terms of these negotiated contracts, properly read together, presume BOR's discretion in their implementation. Moreover, reading BOR's discretion to manage and deliver "available water" out of the plain language of the Repayment Contracts disconnects them from their congressional authorization.

Thus, under ¶ *14*, after BOR made all of the 2002 contract deliveries of "available water," and [if] the "actual available water," § 18j, in 2003, is less than the estimated firm yield because of the drought, BOR has discretion under these negotiated contracts to determine the "available water" to allocate to Intervenors and to fulfill its obligations under the ESA.[27] Surely, BOR's reinitiation of consultation with FWS would otherwise remain a futile act given the district court's finding of substantive violations of the ESA.

This result is fully in line with *O'Neill*, *Houston*, and *Klamath*, correctly relied upon by the district court. *O'Neill* turned on contract interpretation, as does this case. Addressing BOR's argument that the language of the shortage clause is "broad and unambiguous and that short-

party from the application of a subsequent sovereign act (including an Act of Congress), nor will an ambiguous term of a grant or contract be construed as a conveyance or surrender of sovereign power. None of the parties addressed this doctrine.

**26.** *Jicarilla Apache Tribe v. United States*, 657 F.2d 1126, 1133 (10th Cir.1981), looked to New Mexico law to define beneficial use, not-

ing that water conservation and preservation are "of utmost importance," and the prevention of "waste of water" figured prominently in state court discussions of the definition.

**27.** Of course, how BOR exercises that discretion will be tied to the BO resulting from BOR and FWS' reinitiating consultation.

age stemming from mandatory compliance with ESA and CVPIA are shortages resulting from 'any other causes,'" 50 F.3d at 682–83, the court stated, " '[a]ny other causes' is a catchall phrase that does not 'explicitly' include *any* particular causes." *Id.* at 683 (emphasis in original). The court concluded, "the contract's liability limitation is unambiguous and that an unavailability of water resulting from the mandates of valid legislation constitutes a shortage by reason of 'any other concluded 'D'[n]othing in the [ ] contract surrenders in 'unmistakable terms' Congress's sovereign power to enact legislation. Rather, the contract was executed pursuant to the 1902 Reclamation Act and all acts amendatory or supplementary thereto.' " *Id.* at 686. There, as here, the "contract contemplates future changes in reclamation laws." *Id.*[28]

In *Houston,* which involved water renewal contracts to be negotiated after passage of the ESA and the CVPIA, the water districts argued BOR lacked "discretion to alter the terms of the renewal contracts, particularly the quantity of water delivered." 146 F.3d at 1125. The court rejected the Solicitor of the Interior's conclusion he lacked "discretion to change the quantity of water delivered under the contracts because the districts have 'a first right ... to a stated share or quantity of the project's available water supply.' " *Id.* at 1126. The court relied on *O'Neill* to recognize "the total amount of available project water could be reduced in order to comply with the ESA or state law." *Id.* The Ninth Circuit concluded when negotiating the renewal contracts, BOR has discretion to alter the key terms and "may be able to reduce the amount of

water available for sale if necessary to comply with ESA." *Id.*

In *Klamath,* third-party water users sought to enforce water contracts with BOR as third-party beneficiaries entitled to enforce the existing terms of contracts negotiated in 1956. 204 F.3d at 1206. Holding the water users did not have any rights to enforce the contracts other than those of "incidental beneficiaries," the court first observed that the contract "evince[d] the unmistakable intent that Reclamation controls the Dam ... and makes clear that the United States retains overall authority over decisions on use of Project waters." *Id.* at 1213. The responsibilities of that status included, "the authority to direct Dam operations to comply with the ESA." *Id.*

Although the CVPIA and the ESA figured into each of these cases, three general precepts emerge which underpin our conclusion here. First, under principles of contract interpretation, the plain terms govern. Second, the contracts, written under the reclamation laws, and all "acts amendatory and supplementary thereto," envision applying subsequent legislation in their interpretation. Finally, the plain terms of the shortage clauses provide the basis for BOR's retaining discretion to allocate available water to comply with the ESA. We therefore hold that the Repayment Contracts give BOR discretion to reduce contractual deliveries of available water to prevent extinction of the silvery minnow.

This conclusion not only fully reflects the terms of the Repayment Contracts but also the absence of any contractual provi-

---

**28.** BOR excises only a portion of *O'Neill's* quoting one of the parties' argument that "CVPIA marks a shift in reclamation law modifying the priority of water uses." 50 F.3d at 686. The court then stated, "There is

nothing in the contract that precludes such a shift," aligning it with the general principles of the doctrine of unmistakable terms, not precluding the ESA from serving as a subsequent legislative enactment. *Id.*

sion specifying absolute amounts of water. Given the potential for fluctuation in the "actual available water" and "estimated firm yield," as acknowledged by BOR, and the contracts' recognition of the possible reductions in "available water," BOR's discretion to reduce contract deliveries for "other causes" to include its compliance with the ESA comports with the reality of performing the Repayment Contracts and is consonant with the analysis of *United States v. Winstar Corp.*, 518 U.S. 839, 877, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

### VII. State of New Mexico—02–2254

■ The New Mexico Attorney General, the Office of the State Engineer, and the New Mexico Interstate Stream Commission (collectively, the State), intervened to articulate collective interests arising from their control of the use of water in New Mexico. *See* N.M. Const. art. XVI,[29] § 2; N.M. Stat. Ann. §§ 72–1–1[30], 72–12–1.[31] As a signatory to the Rio Grande Compact, the Colorado River Compact, and the Upper Colorado River Basin Compact,[32] the State sought to protect its responsibility for allocating and administering its waters and fulfil its role as *parens patriae*. Alleging the district court's order impairs its ability to supervise the appropriation and

distribution of state waters, the State contends the court's "seizing" water from Heron Reservoir irreparably harms its citizens. This error springs from the district court's failure to recognize that SJC Project water is entirely imported from the Colorado River and has no effect on the flows of the Rio Grande. In the State's view, the lack of native water causes the harm. Thus, the causal link between trans basin water from the SJC Project and jeopardy to the silvery minnow is missing. The question, then, is not "whether *imported* water, the diversion and use of which in no way harms the minnow" supports injunctive relief, but whether the ESA requires BOR to expand its consultation with FWS to include seizing water from contractors, an action BOR did not propose to take. The district court's remedy, the State maintains, usurps BOR's authority, misreads the ESA, and misinterprets the Repayment Contracts and the SJCP Act.

To support this position, the State offers its interpretation of the Repayment Contracts, bottomed on the view that Congress enacted the SJC Project "to provide sufficient water for human needs through times of drought." Water for "municipal,

---

**29.** N.M. Const. Art. XVI—states:

The unappropriated water of every natural stream, perennial or torrential, within the state of New Mexico, is hereby declared to belong to the public and to be subject to appropriation for beneficial use, in accordance with the laws of the state. Priority of appropriation shall give the better right.

**30.** N.M. Stat. Ann. § 72–1–1 states:

All natural waters flowing in streams and watercourses, whether such be perennial, or torrential, within the limits of the state of New Mexico, belong to the public and are subject to appropriation for beneficial use.

**31.** N.M. Stat. Ann. § 72–12–1 provides:

The water of underground streams, channels, artesian basins, reservoirs or lakes,

having reasonably ascertainable boundaries, are declared to be public waters and to belong to the public and to be subject to appropriation for beneficial use.

**32.** Compacts are agreements between states which Congress must approve. From the federal perspective, when Congress consents to these state agreements under the Compact Clause of the Constitution, Art. I, § 10, cl. 3, the compact becomes a "mechanism of legal control over affairs that are projected beyond State lines and yet may not call for, nor be capable of, national treatment." *Petty v. Tennessee–Missouri Bridge Comm'n*, 359 U.S. 275, 282 n. 7, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959).

domestic and industrial uses" is the principal purpose of the Project; recreation, fish and wildlife benefits are incidental to this goal. With these two tiers of beneficial use,[33] the contractual provisions on "drought and other causes" are merely boilerplate found routinely in BOR contracts and intended solely to protect the public purse in the event of "the lack of natural flows or unforeseen occurrences."

The State's argument rests on a mistaken reading of *Jicarilla Apache Tribe v. United States*, 657 F.2d 1126 (10th Cir. 1981), which does not broadly stand for the proposition that using SJC Project water for recreation, fish and wildlife purposes is not beneficial under the SJCP Act and state law. In deciding whether the City of Albuquerque could divert solely for recreational purposes its "excess water," most of which would evaporate in the planned reservoir storage, the court acknowledged, "[i]t generally can be said that state law governs the distribution of water from federal projects unless Congress expresses a different approach." *Id.* at 1133. In New Mexico, an arid state, "[w]ater conservation and preservation [are] of utmost importance. Its utilization for maximum benefits is a requirement second to none, not only for progress but for survival." *Id.* (citation omitted). Thus, absent a specific congressional authorization, "storage of [project] water is to be only for beneficial consumptive use." *Id.* at 1139.[34] Evaporation of 93% of the stored water,

then, was not a beneficial use sanctioned by the SJCP Act.

■ Diverting SJC Project water to prevent jeopardy to the silvery minnow is a beneficial use under New Mexico law and the SJCP Act. The SJCP Act includes use of project water for fish and wildlife as a beneficial use and does not distinguish between primary and incidental benefits. Moreover, this use is consistent with the Colorado River Compact of 1922 and the Upper Colorado River Basin Compact of 1948. The State is a signatory of both.

Thus, the State's interpretation of the Repayment Contracts based on its understanding of the SJCP Act and the statutory scheme it incorporates is incorrect. The Repayment Contracts include the intent to "replace depletions in the Rio Grande Basin." To that end, they permit contracting parties to divert and apply Project water directly from the Rio Grande or offset pumping underground water with Project water. § 18d. Indeed, the Middle Rio Grande irrigation and diversion system, as a practical matter, functions as an interconnected series of dams and reservoirs, transporting SJC Project water which may offset depletions caused by natural and man-made circumstances. The record fully documents this continuing practice, defeating the State's contention that SJC Project water does not harm the silvery minnow. Further, no party contests the permanent effects of the opera-

---

**33.** "Beneficial use is 'a restrictive concept of valid water uses in the water law of the arid western states requiring that water only be used for purposes that are beneficial to the user and to society in general, such as irrigation and municipal uses.'" Sharon P. Gross, *The Galloway Project and the Colorado River Compacts*, 25 Nat. Resources J. 935 (1985), *quoting* Prof. Albert E. Utton, Glossary of Terms Commonly Used in Water Law (1985). New Mexico law, generally, states that a beneficial use cannot include wasting water. *See*,

e.g., *Snow v. Abalos et al.*, 18 N.M. 681, 140 P. 1044, 1048 (1914) ("but it is the application to a beneficial use which gives the continuing right to divert and utilize the water.").

**34.** In its analysis, the court indicated that 43 U.S.C. § 620, contemplated investigating construction of "public recreational facilities" and "facilities to mitigate losses of and improve conditions for, the propagation of fish and wildlife."

tion of federal projects on the life of the Middle Rio Grande.

As we have noted, the SJCP Act clearly contemplates using Project water for fish and wildlife benefits. Under state law, such releases constitute a beneficial use. Indeed, the State's ongoing efforts—the Conservation Water Agreement of 2001 between the State and the federal government to store and release up to 100,000 a.f. of Middle Rio Grande water over three years, convening the Middle Rio Grande Endangered Species Collaborative Workgroup; and its record of participation in hatchery augmentation of the silvery minnow and efforts at habitat restoration—defy the fixed stance the State takes here to marginalize BOR's obligations under the ESA.

Finally, we note the governor of New Mexico requested relief under the Reclamation States Emergency Drought Relief Act, 40 U.S.C. §§ 2201–2226. Under § 2212(d):

> The Secretary may make water from Federal Reclamation projects and non-project water available on a nonreimbursable basis for the purposes of protecting or restoring fish and wildlife resources, including mitigation losses, that occur as a result of drought conditions or the operation of a Federal Reclamation project during drought conditions. The Secretary may store and convey project and nonproject water for fish and wildlife purposes, and may provide conveyance of any such water for both State and Federal wildlife habitat and for habitat held in private ownership. The Secretary may make available water for these purposes outside the authorized project service area. Use of the Federal stor-

age and conveyance facilities for these purposes shall be on a nonreimbursable basis.

Given the breadth of this legislation, the plain meaning of the ESA, and our interpretation of the Repayment Contracts, we reject the State's characterization of the district court's order. The remedy the district court crafted fully appreciates the State's commitment to protecting its water resources and ensuring BOR's duty under the ESA.

## VIII. City of Albuquerque—02–2267

The City contends reallocation of imported Colorado River Basin water to alleviate the effects of the drought on the silvery minnow exceeds BOR's authority under the ESA.[35] The error, the City maintains, derives from the district court's view the ESA overrides pre-existing contractual rights. Although the ESA contemplates BOR's entering into contracts and granting leases constitute "action" under 50 C.F.R. § 402.02(c), these pre-ESA contracts cannot trigger expanded consultation duties unrelated to the express terms of the contract. In its view, the fixed Repayment Contracts, essentially, are off-limits as a mechanism of any solution to ESA compliance. Because the ESA merely provides "directives" and does not represent any new grant of power, BOR cannot avoid jeopardy to the silvery minnow by acting outside of its agency authority. *American Forest & Paper Ass'n v. EPA*, 137 F.3d 291, 299 (5th Cir.1998); *Platte River Whooping Crane Critical Habitat Maint. Trust v. FERC*, 962 F.2d 27, 34 (D.C.Cir.1992).

In support of this position, the City reminds that the United States owns no

---

**35.** In an abundance of caution, the City contends the district court's order interpreting its contract rights adversely to its interests gives

it standing. We agree. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

water rights under state law but holds only a duty to store water in Heron Reservoir for the beneficial use of SJC contractors. The absence of any rights to the water it diverts defeats BOR's power to direct the use of the water it stores to protect endangered species. In contrast, the City asserts the Repayment Contract gives the City a "perpetual right" to use project water along with, "at the very least, an exclusive contractual right to its share of the water supply." Given this right, the City contends the district court erred when it found, "[a]t most, the City has an inchoate expectation to receive the full amount of its 2003 contract deliveries during 2003 ... subject to factors that affect the amount of water available."

■ The City misreads the Repayment Contracts as "perpetual contractual obligations" and "perpetual contracts" providing "perpetual and exclusive rights" to beneficial and consumptive use. The 1963 Repayment Contract states, "[u]pon the expiration of said term [until water supply costs payable by the City ... are paid in full], the City shall have a vested right to renew said contract *indefinitely* at appropriate annual service charges so long as a water supply *may be available* and the City is current on its payments for water service." 1963 Repayment Contract § 26 (emphasis added). Indefinite, having no exact limits, cannot be read to mean continuing forever.

Rather, as we have discussed, the express terms of the 1963 Repayment Contract direct BOR to limit deliveries (liability for delivering the contractual share of water) for "drought or other causes;" to reallocate costs "[i]f unusual circumstances arise which throw the allocation out of balance," which necessarily may include "fish and wildlife;" "to replace depletions in the Rio Grande Basin;" and to allocate proportionately "[d]uring periods of scarcity when the actual available water supply may be less than firm yield." Although the Repayment Contract gives the City a "permanent right" to the use of its allocation of water when its repayment obligations are met, that right remains conditioned by these and other contractual terms. This view does not alter the City's contractual rights but aligns them with the overall purposes of the Reclamation Acts, the SJC Project, and subsequent legislation.[36]

## IX. Middle Rio Grande Conservancy District—02–2255

The MRGCD extends 150 miles from the Cochiti Dam, south of the city of Santa Fe, to the Bosque del Apache National Wildlife Refuge, and encompasses 128,787 acres of irrigable lands, half of which are presently irrigated. The MRGCD includes six Indian pueblos, Albuquerque, and numerous towns and villages. Since its creation under the New Mexico Conservancy Act, N.M. Stat. Ann. §§ 73–14–1 to 73–14–5, the MRGCD has grown from its Albuquerque Chamber of Commerce and landowner roots to become a key participant in state water management.[37] Pres-

---

**36.** It bears noting the City contracted with BOR on April 22, 1997, under the Reclamation Laws and the ESA, "to assure the water needs of the minnow and the irrigators within the Middle Rio Grande Conservancy District." The two-year contract provided for BOR to purchase and use up to 30,000 a.f. of its SJC Project water from Abiquiu Reservoir "to augment the total water supply to the Middle Rio Grande Valley." The contract reflects the City's commitment to protecting the silvery minnow.

**37.** MRGCD is accountable to the New Mexico State Engineer who has monitored its water use. In fact State Engineer Thomas C. Turney advised in a March 21, 2001 letter to BOR and the MRGCD that in the absence of

ently, of its 238,000 a.f. of water, MRGCD asserts that 217,000 a.f. are native or non-project water and 20,900 a.f. are SJC Project water.

This distinction between native and Project water permeates MRGCD's version of the federal government's rehabilitating and operating the district's irrigation and diversion works, its claim to title of all MRGCD works, and its contention BOR cannot excuse its curtailing private water rights based on its alleged obligations under the ESA. That version is an eddy of details which swallows the inescapable fact that MRGCD agreed to the federal government's financial rescue, rebuilding, restoring, and expanding its irrigation storage and delivery capabilities, in exchange for the transfer of all MRGCD assets and repayment of the costs of the restoration. MRGCD also agreed to BOR's management of project works. As foreseen by that agreement, MRGCD amended the 1951 Repayment Contract in 1963 to supplement its supply of native water with SJC Project water.

In 1974, BOR transferred to MRGCD the operation and maintenance of all its irrigation and drainage works except for El Vado Dam and Reservoir, San Acacia Diversion Dam, and other channelization and flood protection works operated by the Corps. In *Order I,* the district court found:

> MRGCD's filing the required state Proof of Beneficial Use, the State would assert in this litigation that "7.2 a.f. of water per acre of irrigated non-Pueblo lands on an annual basis is a sufficient and non-wasteful diversion of water." This figure contrasts with the State's "farm delivery requirement of 3.0 acre-feet per acre annually" and the MRGCD's diverting "over 11 acre-feet per acre" from 1989 through 1999.

38. 28 U.S.C. § 2409a(b) states:
 b) The United States shall not be disturbed in possession or control of any real proper-

BOR owns El Vado Dam and Reservoir and is authorized by federal law and state permit to store native Rio Grande water there for MRGCD. BOR releases that water at MRGCD's call as agreed by contract and authorized by the state permit. MRGCD operates the United States' diversion dams to divert these native flows for MRGCD and Pueblo Indian use during the irrigation season.

Nonetheless, to fortify its substantive arguments here, MRGCD filed a cross claim to quiet title to MRG Project works under 28 U.S.C. § 2409a(b).[38] Correctly, the district court did not resolve the claim which will remain pending until the "conclusion of any appeal therefrom, and sixty days." When it is properly before the district court, that claim will, no doubt, be resolved by reviewing the federal reclamation legislation authorizing the MRG Project and the 1951 Repayment Contract which provided:

> Title to all works constructed by the United States under this contract and to all such works as are conveyed to the United States ... shall ... be and continue to be vested in the name of the United States until otherwise provided by Congress, *notwithstanding the transfer hereafter of any such works to the District for operation and maintenance.*

ty involved in any action under this section pending a final judgment or decree, the conclusion of any appeal therefrom, and sixty days; and if the final determination shall be adverse to the United States, the United States nevertheless may retain such possession or control of the real property or of any part thereof as it may elect, upon payment to the person determined to be entitled thereto of an amount which upon such election the district court in the same action shall determine to be just compensation for such possession or control.

1951 Repayment Contract § 29 (emphasis added). The 1951 Repayment Contract assigned all of the MRGCD's water filings to the United States. Not simply full repayment but also approval by Congress must predicate the reversion of title to the MRGCD under the MRG Project Act and 1951 Repayment Contract. Hence, under all of the circumstances, we presume title to the MRG Project works remains in the United States during the pendency of this litigation.

 Absent the quiet title claim, our resolution of MRGCD's appeal must remain focused on BOR's obligations under the ESA as a consequence of its water resource development whether that water is native or imported.[39] That BOR neither owns nor holds rights to native waters, has no reservoirs on the Middle Rio Grande, or "has neither purchased nor appropriated any water for delivery to Middle Valley farmers," is not determinative of BOR's obligation to consult with FWS and comply with the ESA. BOR's retaining authority to manage MRGCD and SJCP works triggers its ESA obligations. *Klamath Water Users,* 204 F.3d at 1213.[40]

Although MRGCD insists that BOR has neither an obligation nor a "right" to consult with FWS to issue a new Biological Opinion that contains a reasonable and prudent alternative that avoids jeopardy, we note another statutory foundation for the district court's directive. The Fish and Wildlife Coordination Act (FWCA), was enacted August 12, 1958, before passage of the SJCP Act of 1961. Under 16 U.S.C. § 662(c), "Federal agencies authorized to construct or operate water-control projects are authorized to modify or add to the structures ... to accommodate the means and measures for such conservation of wildlife resources as an integral part of such projects." Section 662(a) provides:

> whenever the waters of any stream or other body of water are proposed or authorized to be impounded, diverted, the channel deepened, or the stream or other body of water otherwise controlled or modified for any purpose whatever ... by any department or agency of the United States ..., department or agency first shall consult with the United States Fish and Wildlife Service, Department of the Interior, ... with a view to the conservation of wildlife resources by preventing loss of and damage to such resources as well as providing for the development and improvement thereof in connection with such water-resource development.

When MRGCD amended the 1951 Repayment Contract to acquire a supplemental supply of water from SJC Project water, it necessarily agreed to the reach of the FWCA as well as the panoply of recla-

---

**39.** Klamath Water Users Association states in its amicus brief in support of appellants, "[t]he fact that the stored water in Heron Reservoir is imported makes appellants' case particularly compelling, but it is not determinative. Practically and legally, diverting 'native' water to storage during surplus flow period is identical to importing water from another basin."

**40.** Moreover, a line of cases recognizes the difference between acquiring water rights and operating federal projects. *Ivanhoe Irrigation Dist. v. McCracken,* 357 U.S. 275, 291, 78

S.Ct. 1174, 2 L.Ed.2d 1313 (1958). In *Israel v. Morton,* 549 F.2d 128, 132 (9th Cir.1977), the court stated:

> A distinction must be recognized between the nature of nonproject water, such as natural-flow water, and project water, and between the manner in which rights to use of such waters are obtained. Right to use of natural-flow water is obtained in accordance with state law.... Project water, on the other hand, would not exist but for the fact that it has been developed by the United States.

mation laws recited in both contracts.[41] We further note, contrary to MRGCD's contention, the central issue before us— whether BOR has discretion to reallocate water to comply with the ESA—is also adumbrated by the Reclamation States Emergency Drought Relief Act of 1991, 43 U.S.C. § 2201. Although MRGCD's arguments rest on the premise its native water is separate, distinct, and entirely removed from the "federal" reservoirs and other project works, that water flows as a consequence of the original federal rescue of the conservancy district. In that process, as MRGCD has acknowledged, the wildlife habitat of the Middle Rio Grande channel has been degraded. Congress has directed the same federal agencies to alleviate that consequence under this array of legislation.

### X. Rio Chama Acequia Association— 02–2295

An association of 27 *acequias*, irrigation ditches, the RCAA depends for its "very survival" upon the water in the Rio Chama, a northern tributary of the Rio Grande.[42] Entirely privately owned by its members, the RCAA emphasizes none of its ditches are located on the Middle Rio Grande and no silvery minnow are found in any of its water sources, which are 100 miles north on the Rio Chama. RCAA distinguishes that the 1250 a.f. of SJC Project water stored at Abiquiu Reservoir provides "the only feasible means of irrigating land, used predominantly to grow crops such as alfalfa, which in turn feeds the owners' livestock and other animals" in

a cultural ecosystem now threatened by the silvery minnow's critical habitat needs. RCAA offers that "Many different facets of life on the acequia are intertwined, and therefore, when one aspect of traditional life is removed, the entire system could potentially collapse." Thus, the question for the RCAA is whether, having relied for centuries on their limited water rights, it will be permitted to survive. In ordering relief, RCAA maintains the district court failed to weigh the hardship to the RCAA, especially the irreparable economic loss subsistence farmers will suffer.

■ Many of the issues RCAA has raised have already been addressed or are now moot, for example, challenging the flow levels ordered for the duration of 2002. RCAA, however, contests the district court's standard for granting Plaintiffs injunctive relief, contending that by affording endangered species the highest of priorities under *Hill*, it completely ignored "traditional equitable principles."

Surely, Congress could not have spoken any more clearly, as *Hill* found in articulating the standard for injunctive relief under the ESA:

> Concededly, this view of the Act will produce results requiring the sacrifice of the anticipated benefits of the [Tellico Dam] project and of many millions of dollars in public funds. But examination of the language, history, and structure of the legislation under review here indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities.

---

**41.** Moreover, as we have already noted, although MRGCD has not recognized the issue, under the doctrine of unmistakable terms, "the contract contemplates future changes in reclamation laws." *O'Neill*, 50 F.3d at 686 (quoting *Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986)).

**42.** Non–Indian settlers constructed the ditches beginning as early as 1598, and the descendants of these Spanish settlers continue to live in the Rio Chama Valley, the Espanola area, and other parts of New Mexico and southern Colorado.

437 U.S. at 174, 98 S.Ct. 2279. Recognizing that loss of a species is irreversible and irretrievable, *Hill* assured, "[l]est there be any ambiguity as to the meaning of this statutory directive, the Act specifically defined 'conserve' as meaning 'to use and the use of *all methods and procedures which are necessary* to bring *any endangered species or threatened species* to the point at which the measures provided pursuant to this chapter are no longer necessary.'" *Id.* at 180, 98 S.Ct. 2279 (emphasis in original); *see also, Strahan v. Coxe*, 127 F.3d 155, 160 (1st Cir.1997); *Nat'l Wildlife Fed'n v. Burlington Northern R.R., Inc.*, 23 F.3d 1508, 1511 (9th Cir.1994).

As the First Circuit noted in *Water Keeper Alliance v. U.S. Dept. of Defense*, 271 F.3d 21, 31 (1st Cir.2001), which RCAA recited for its contention the court applied the wrong standard, "[w]hat standard of review applies depends on the question being asked." Here, the question before the district court was whether substantive provisions of the ESA were violated. The court properly applied *Hill's* standard for granting preliminary relief under the ESA. The "enduring or permanent nature" of an environmental injury tips the balance. *Catron County*, 75 F.3d at 1440.

Further, in so concluding, we observe the record fully reflects the district court's painstaking, patient, and persistent efforts to entertain and address the complex legal and equitable issues spawned by this litigation. Surely, as a resident of the community, the district judge fully appreciated the many equities each party presented.

Finally, RCAA, like other Intervenors, has challenged the district court's statement, "[t]he Federal Government must compensate those, if any, whose contractual rights to water are reduced in order to meet the aforementioned [2002] flow requirements." Although that portion of the court's order is now moot, the issue of compensation will likely resurface with reallocations that may eventuate from BOR's exercise of discretion. Clearly, that issue is not ripe for our review, and any further discussion here is unwarranted.

## XI. Conclusion

Scientific literature likens the silvery minnow, to a canary in a coal mine, the "last-remaining endemic pelagic spawning minnow in the Rio Grande basin." As its population has steadily declined and now rests on the brink of extinction since its listing in 1994, we echo *Hill's* "concern over the risk that might lie in the loss of *any* endangered species." 437 U.S. at 177, 98 S.Ct. 2279. *"The institutionalization of that caution* lies at the heart of [the ESA]." *Id.*, citing the Report of the House Committee on Merchant Marine and Fisheries on H.R. 37 (emphasis in original). In so broadly legislating, Congress sought to recognize that endangered species provide "keys to puzzles which we cannot solve, and may provide answers to questions which we have not yet learned to ask." *Id.* Like all parts of that puzzle, the silvery minnow provides a measure of the vitality of the Rio Grande ecosystem, a community that can thrive only when all of its myriad components—living and non-living—are in balance. All of the parties have admirably participated in sustaining the vitality of that system. In that process, BOR's discretion in operating these federal projects will more properly effect its consultation responsibilities with FWS and its water management role. To that end, we conclude the district court properly held BOR has discretion to reduce deliveries of water under its contracts to comply with the ESA. We therefore AFFIRM.

SEYMOUR, Circuit Judge, with whom JOHN C. PORFILIO, Circuit Judge, joins, concurring.

As the majority and dissent agree, this case turns on whether the government re-

tains discretion under the contracts with the water users to apply the provisions of the Endangered Species Act (ESA). I agree completely with the scholarly and comprehensive opinion of my colleague that the contracts themselves provide such discretion. I write separately only to expand alternatively upon the doctrine of unmistakable terms, a principle of federal contract law that has been, curiously in my view, largely ignored in this litigation.[1] Thus, even if I were to agree with the dissent that the contracts themselves do not expressly retain authority in the agency to reduce water deliveries except in the event of naturally caused water shortages, under the unmistakable terms doctrine the ESA nonetheless modifies the contracts because the contracts do not affirmatively state that future legislation will not apply.

As described by the Supreme Court, the doctrine of unmistakable terms posits that absent an "unmistakable" provision to the contrary, contractual arrangements, including those to which a sovereign itself is a party, remain subject to subsequent legislation by the sovereign. We thus rejected the proposal to find that a sovereign forever waives the right to exercise one of its sovereign powers unless it expressly reserves the right to exercise that power in the contract, and

held instead that unmistakability was needed for waiver, not reservation.

*United States v. Winstar Corp.,* 518 U.S. 839, 877–78, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (citing *Bowen v. Pub. Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986) (internal quotations omitted)) (Souter, J., joined by Stevens, J., Breyer, J., and O'Connor, J.). In other words, a contract to which the government is a party remains subject to the demands of a subsequent exercise of sovereign power unless the contract expressly provides in unmistakable terms that subsequent sovereign acts will not affect it. A silent contract preserves the government's right to modify it by subsequent legislation.

Given the various opinions in *Winstar,* none of which commanded a majority, it is clear that not all contracts to which the government is a party are subject to the unmistakable terms doctrine. *See Yankee Atomic Elec. Co. v. United States,* 112 F.3d 1569, 1578–79 (Fed.Cir.1997); Joan E. Drake, *Contractual Discretion and the Endangered Species Act: Can the Bureau of Reclamation Reallocate Federal Project Water for Endangered Species in the Middle Rio Grande?,* 41 NAT. RESOURCES J. 487, 523 (2001) ("In sum, the fractured Winstar

---

1. I am reminded of

"... the curious incident of the dog in the night-time."
"The dog did nothing in the night-time."
"That was the curious incident," remarked Sherlock Holmes.

SIR ARTHUR CONAN DOYLE, *Silver Blaze, in* THE ADVENTURES AND MEMOIRS OF SHERLOCK HOLMES 272 (Modern Library 2001) (1894).

I note in particular the failure by the federal defendants to discuss their reasons, if any, for concluding that the doctrine does not apply here, to respond to the argument by others that it does apply, or indeed even to mention the unmistakable terms doctrine in passing. One authority has made the following observation relevant to this failure:

For most of its history and in most of the West, the Bureau has avoided confrontation and controversy by siding with irrigators, even when that meant ignoring clear requirements of federal law.... But while it may be reluctant to act, the federal government clearly has considerable authority over the use of project water.

Reed D. Benson, *Whose Water Is It? Private Rights and Public Authority Over Reclamation Project Water,* 16 VA. ENVTL. L.J. 363, 409–10 (1997). Indeed this authority recognizes, as the dissent refuses to do, that "even though it has entered into a contractual relationship to deliver water, the United States retains its sovereign authority unless surrendered in unmistakable terms." *Id.* at 412.

decision leaves us with some uncertainty regarding the extent and applicability of the unmistakable terms doctrine in specific situations."). Significantly for our purposes, however, the justices all agreed in *Winstar* that the doctrine nonetheless has continued viability, and cases subsequent to *Winstar* have found it dispositive in a variety of circumstances. *See, e.g., Klamath Water Users Protective Ass'n v. Patterson,* 204 F.3d 1206, 1213–14 (9th Cir. 1999); *Rhode Island Laborers' Dist. Council v. Rhode Island,* 145 F.3d 42, 44 (1st Cir.1998); *Tamarind Resort Assoc. v. Gov't of the Virgin Islands,* 138 F.3d 107, 112 (3d Cir.1998). A careful reading of the opinions in *Winstar* reveals that a majority of the justices would agree that it applies here.

Under the Court's principle opinion, authored by Justice Souter and joined by three other justices, "application of the doctrine ... turns on whether enforcement of the contractual obligation alleged would block the exercise of a sovereign power of the Government." *Winstar,* 518 U.S. at 879, 116 S.Ct. 2432. In that case, the plaintiffs sought only *damages* from the government for its breach of contract occasioned by the applicability of legislation enacted after the contract was executed. Most significantly for our purposes, the plaintiffs did *not seek injunctive relief* or some form of exemption to prevent the subsequent legislation from applying to their contracts; rather, they merely sought damages for the loss suffered as a result of the application of that new law.

> The [plaintiffs] do not claim that the Bank Board and FSLIC purported to bind Congress to ossify the law in conformity to the contracts; they seek no injunction against application of FIRREA's new capital requirements to them and no exemption from FIRREA's terms. They simply claim that the Government assumed the risk that subsequent changes in the law might prevent it from performing, and agreed to pay damages in the event that such failure to perform caused financial injury.

*Id.* at 871, 116 S.Ct. 2432. Indeed, the plaintiffs acknowledged that the contracting government agencies could not bind Congress not to change government policy. *Id.* at 881, 116 S.Ct. 2432. Justice Souter rejected the government's argument that the unmistakable terms doctrine precluded an award of damages for breach of the contract in *Winstar,* holding that such an award did not block the exercise of sovereign power because the government remained free to enforce against these very plaintiffs its sovereign authority as embodied in the subsequent legislation. Justice Souter pointed out that when the government indemnifies its contracting partners against the risk of financial losses arising from regulatory change, its sovereign powers are not implicated at all where "there has been no demonstration that awarding damages for breach would be tantamount to any such limitation." *Id.* at 881, 116 S.Ct. 2432.

In the instant case, to the contrary, defendants are water users who seek to prevent the government from taking any of the water for ESA purposes. In other words, enforcement of the contractual provisions as demanded by defendants would effectively limit the government's sovereign authority to enforce the provisions of the ESA. Under the analysis posited by Justice Souter, therefore, the unmistakable terms doctrine clearly applies to this contract. Execution of the contract itself and the duties imposed under the Endangered Species Act both embody acts of sovereign authority. The government has not waived in unmistakable terms its power to impose environmental laws on these contracts, and it is clear that enforcing the contract provisions as demanded by the

water users would frustrate the government's obligations under the ESA.

The doctrine also applies here under the position of the dissenters in *Winstar.* Writing in dissent, Justice Rehnquist, joined by Justice Ginsburg, viewed the principal opinion as "drastically reduc[ing] the scope of the unmistakability doctrine, shrouding the residue with clouds of uncertainty, and [limiting] the sovereign acts doctrine so that it will have virtually no future application." *Id.* at 924, 116 S.Ct. 2432. The dissenters disputed the principle opinion's. view that the contract in question did not impact the sovereign's power because it only involved a request for damages that was not the equivalent of an injunction against or exemption from the subsequent legislation. *Id.* at 926, 116 S.Ct. 2432. Under the dissenters' view, the absence of an unmistakable contract term waiving the government's right to amend the contract by subsequent legislation was dispositive and the doctrine should have been applied to the contract in *Winstar* to preclude an award of damages. The unmistakable terms doctrine thus applies in the circumstances before us under both the principle opinion in *Winstar,* in which four justices joined, and under the dissenting opinion to which two justices subscribed.

Although couched in various ways, the dissent here would hold that the doctrine does not apply to these contracts because the government has no discretion under the contracts themselves to change the contract terms and thereby comply with the mandates of the ESA. The dissent stands the unmistakable terms doctrine on its head. The dissent would require that a contract expressly reserve the agency's discretion to modify its terms, while the unmistakable terms doctrine holds, exactly to the contrary, that a silent contract preserves the sovereign's power to modify by subsequent legislation. Under the dissent's view silence negates governmental authority, while under the doctrine silence preserves it. Moreover, by asserting that the unmistakable terms doctrine only applies if the contract says it does, the dissent renders the doctrine meaningless. If the contract itself provides that it is subject to subsequent legislation, resort to the doctrine would never be necessary.

The applicable analysis is straightforward and does not turn on discretion. The government clearly needs no grant of discretion to exercise its sovereign power. Once it has done so, the issue is whether the resulting legislation applies to pre-existing contracts. The answer is provided in part by the unmistakable terms doctrine, which holds that unless the government has surrendered its sovereign authority in unmistakable terms, the contract remains subject to subsequent legislation. In this case, as the dissent concedes, the contracts do not affirmatively provide in unmistakable terms that they will not be subject to subsequent legislation. Accordingly, while I join completely the superb opinion of my colleague that concludes the government expressly reserved discretion in the contracts here, I also believe the doctrine of unmistakable terms mandates the same result.

PAUL KELLY, Jr., Circuit Judge, dissenting.

The Bureau of Reclamation ("BOR") is the largest water wholesaler in the United States; it administers 348 reservoirs and provides one out of five western farmers with irrigation water. *See* Bureau of Reclamation website, Facts & Information, http://www.usbr.gov/main/what/fact.html (last visited May 13, 2003). The court holds that the BOR has discretion to deliver less than the full amount of available San Juan–Chama ("SJC") and Middle Rio

Grande ("MRG") project water to its contractors. As an alternative holding, the court concludes that even in the absence of any pre-existing discretion by the BOR, the doctrine of unmistakable terms allows the BOR to deliver less than the full amount of available water under the contracts. Thus, the BOR, without any recognized property right to the water in question, may use this stored project water to provide instream flows for the silvery minnow to alleviate jeopardy to that species under the Endangered Species Act ("ESA"). In so holding, the court injects uncertainty into settled contractual expectations and profoundly alters, in disregard of relevant statutory and regulatory authority, the obligations of federal agencies under the ESA.

Although I agree with the court that this case is ripe for appellate review, I cannot agree with the court's conclusion that the BOR has discretion to reduce deliveries of available water under its already-negotiated contracts with the various parties in this case.[1] In my view, none of the contract provisions, federal statutes and regulations, or other factors cited by the court provide the BOR with this discretion. Moreover, it is clear that the ESA itself cannot fill this void for the simple reason that the ESA is directed at the exercise of discretionary authority that an agency already possesses, rather than constituting a source of *additional* administrative authority. Nor can I conclude that in the ab-

sence of pre-existing BOR discretion, the doctrine of unmistakable terms amends the contracts to allow unilateral reallocation under the guise of compliance with the ESA. For these reasons, and others set forth below, I dissent.

We have considered the habitat of the silvery minnow before. Recently, in *Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220 (10th Cir.2002), we discussed whether the district court properly required an environmental impact statement ("EIS") to accompany the critical habitat designation of the silvery minnow. *Id.* at 1225–30. In so doing, we commented briefly on the ESA ramifications:

> The federal agencies charged with management of Rio Grande water are prohibited from taking or authorizing any action which diminishes the value of critical habitat for the survival or recovery of the Silvery Minnow. Consequently, federal agencies are prohibited from taking or authorizing any action which deprives critical habitat of its primary constituent elements, those physical and biological features essential to the conservation of the species. Because extensive reaches of the Middle Rio Grande are dry under current water management practices and do not contain "water of sufficient quality to prevent formation of isolated pools," the designation will require the federal water managers to reallocate water for the Minnow's use. The draft Economic

---

1. We do not have all of the parties with an interest in the water before us. The district court denied the Middle Rio Grande Conservancy District's ("MRGCD") motion to dismiss for failure to join the Pueblos of Cochiti, San Felipe, Santo Domingo, Santa Ana, Sandia and Isleta as indispensable parties. The district court found the Pueblos neither necessary, nor indispensable, reasoning that the Pueblos' water rights are senior to the other contractors, the Plaintiffs sought no relief against the Pueblos, the Pueblos were repre-

sented adequately by the federal government, and this was the only forum available given tribal sovereign immunity. *Rio Grande Silvery Minnow v. Martinez*, No. 99–1320 JP/KBM, Doc. 440 at 5–6, 10–11 (D.N.M. July 19, 2000). The government opposed the motion to dismiss, but now reminds us of the Pueblos' rights to use Middle Rio Grande water, and questions its earlier position in light of Plaintiffs' presentation on appeal. Aplt. Reply Br. at 17–18.

Analysis, relied upon by FWS in conducting the EA, recognized that a primary effect of the designation would be to reduce the expenditure of federal funds used to make water available for municipal and agricultural uses.

*Id.* at 1227–28 (footnotes and internal citations omitted). Although the language is broad, we did not consider, and could not consider, the issue of water reallocation in the context presented here. This case involves involuntary and unilateral reallocation. It is not about reallocation accomplished through voluntary exchanges of SJC water for native irrigation water to benefit endangered species. Those voluntary exchanges have required consultation and cooperation, insuring that SJC water is released for beneficial use consistent with the primary purposes of the SJC project. Similarly, this case is not about the government's leasing water rights from willing contractors so as to benefit endangered species.

In my view, the ESA, its implementing regulations and the reclamation acts confer no discretion here and do not permit the BOR to reduce contract deliveries and use the water for the benefit of the silvery minnow. The ESA does not require federal agencies to insure that a species is never jeopardized; rather, it requires the government to insure that its proposed actions are not likely to jeopardize a listed species when the agency retains discretion. *See American Forest & Paper Ass'n v. United States EPA,* 137 F.3d 291, 299 (5th Cir. 1998) ("[T]he ESA serves not as a font of new authority, but as something far more modest: a directive to agencies to channel their *existing* authority in a particular direction."). That discretion is wholly lacking in this case and there simply is no other authority that would allow the district court to order the BOR to withhold or divert water in favor of the silvery minnow. Various parties have participated in preserving the silvery minnow on a voluntary basis, but those parties are entitled to stand on their pre-existing contract rights. Because the water in this case has been fully appropriated pursuant to New Mexico law, the BOR cannot lay claim to a new use of water, even to benefit an endangered species. Upon de novo review of the district court's legal conclusions, I would reverse.[2]

A. *Negotiating These Contracts Does Not Constitute Agency Action Subject to the ESA*

The court appears to hold that the BOR's negotiating and executing the original contracts, concluded long before the enactment of the ESA, constitutes "agency action" consistent with the broad definition contained in the ESA implementing regulations, 50 C.F.R. § 402.02 *Action.*

---

**2.** The district court also ordered the government to compensate any contractors whose water deliveries were shorted under its orders. I Aplt. (COA) App. 144 ("The Federal Government must compensate those, if any, whose contractual rights to water are reduced in order to meet the aforementioned flow requirements."). Not only does this conflict with the district court's reliance on the government non-liability provisions in the contracts, it also lacks the important qualification that contract claims in excess of $10,000 must be resolved in the United States Court of Federal Claims. 28 U.S.C. §§ 1346(a)(2), 1491; *Amerada Hess Corp. v. Dep't of the Interior,* 170 F.3d 1032, 1035 (10th Cir.1999); *Tulare Lake Basin Water Storage Dist. v. United States,* 49 Fed. Cl. 313 (2001) (Court of Federal Claims case adjudicating Fifth Amendment taking claims based upon implementation of ESA). Although I agree with the district court that its orders could certainly result in a taking of a property right, *see Tulare Lake Basin,* 49 Fed. Cl. at 319, I would reverse this directive in light of the way I would resolve the ESA claims.

Ct. Op. at 1128.[3] If that is what the court meant, negotiating and executing these contracts alone would appear to trigger the consultation provisions under § 7 of the ESA, 16 U.S.C. § 1536(a)(2), as well as the Fish and Wildlife Service's ("FWS") responsibility to suggest reasonable and prudent alternatives ("RPAs") to proposed agency action. *See* 50 C.F.R. § 402.03 ("Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control."). The FWS must suggest RPAs if an agency action is likely to result in jeopardy to the continued existence of the species or adverse modification of its critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3). The district court's order requiring the BOR to reduce contract deliveries and restrict future diversions if necessary to meet flow requirements for the silvery minnow is tantamount to imposition of an RPA. Yet, for an RPA, the applicable regulations require discretionary federal involvement and actions within the agency's lawful authority—neither of which is present here.

Although agency action includes the discretionary task of negotiating contracts and renewals, *see* § 402.02, *Action* § (c), here, as noted above, the parties' contracts (those of the MRGCD and the City of Albuquerque ("City")) were formed prior to the ESA. More importantly, these existing contracts reserve no water to the BOR and contain no express provision conferring authority upon the BOR to reallocate water for the benefit of endangered species.

The court relies upon *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1126 (9th Cir.1998), for its conclusion that

"BOR's negotiating and executing *these* contracts is 'agency action.'" Ct. Op. at 1128 (emphasis supplied). But to the extent the court is suggesting that past negotiation and execution of water supply contracts constitutes "agency action," its authority is readily distinguishable. *Houston* involved contract renewals. The renewals were subsequent to the enactment of the ESA, and Congress had amended the specific reclamation laws applicable to those renewals. Indeed, the *Houston* court specifically noted that "[c]learly there was some discretion available to the Bureau during the negotiation process." *Houston*, 146 F.3d at 1126.

Subsequent Ninth Circuit authority interpreting *Houston* refutes the interpretation that merely because an agency negotiated a contract, the prior negotiation constitutes "agency action." In *Environmental Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073 (9th Cir.2001), the court rejected an argument that "existing contracts and permits that are in no way related to the ESA or do not provide mechanisms to protect threatened and endangered species may require alteration if necessary to comply with the ESA." *Id.* at 1082 (internal quotation omitted). The court stated:

> We did not suggest in *Houston* that once the renewed contracts were executed, the agency had continuing discretion to amend them at any time to address the needs of endangered or threatened species.

*Id.* BOR's past actions in negotiating and executing these contracts do not constitute present agency action subject to the ESA. Moreover, none of the existing SJC contracts will expire within the next five

---

**3.** Judge Porfilio has authored the main opinion for the court that I will refer to as the court's opinion (Ct.Op.). He has also joined Judge Seymour's concurring opinion that I will refer to as · the concurring opinion (Conc.Op.), fully recognizing that both are opinions of the court with panel majorities.

years. X Aplt. (COA) App. 2236 (June 29, 2001).

It cannot be said that the BOR engages in agency action merely by performance of its contractual responsibilities to deliver available stored water. The FWS correctly recognized this in describing the federal action in its 2001 Biological Opinion. X Aplt. (COA) App. 2234–2242; *see also* 50 C.F.R. § 402.02, *Effects of an action.* It is not enough to conclude that there is agency action within the meaning of the ESA anytime there are "ongoing federal reservoir or water operation[s]." Aplee. Br. at 28. Such an interpretation would shift the focus entirely onto the actor rather than the character of the action.

To constitute agency action subject to the ESA, the court must find that the BOR has the discretion to unilaterally reduce deliveries of available project water under its already-negotiated contracts *and to reallocate and use that water for endangered species.* If the BOR lacks such discretion, modifying the BOR's performance of the contracts cannot form the basis of an RPA, where RPAs are defined as "alternative actions identified during formal consultation" that are within an agency's authority, consistent with the purpose of the proposed action, and economically feasible. 50 C.F.R. 402.02, *Reasonable and prudent alternatives.* Though the ESA is construed broadly, it does not permit an agency to breach non-discretionary contractual terms. *See Sierra Club v. Babbitt,* 65 F.3d 1502, 1511–12 (9th Cir.1995) ("In sum, we hold that Congress did not intend for section 7 to apply to an agreement finalized before passage of the ESA where the federal agency currently lacks the discretion to influence the private activity for the benefit of the protected species."); *Platte River Whooping Crane Critical Habitat Maint. Trust v. FERC,* 962 F.2d 27, 34 (D.C.Cir.1992) (holding

that an interpretation of the ESA that obligates a federal agency to do "whatever it takes" to protect an endangered species is "farfetched" because "the statute directs agencies to 'utilize their authorities' to carry out the ESA's objectives; it does not *expand* the powers conferred on an agency by its enabling act.") (emphasis in original and citation omitted); *Defenders of Wildlife v. Norton,* 257 Supp.2d 53, 67–68 (D.D.C. 2003) ("The formulas established by the Law of the River strictly limit Reclamation's authority to release additional waters to Mexico, and Section 7(a)(2) of the ESA does not loosen those limitations or expand Reclamation's authority.").

**B.** *Neither the BOR Contracts nor the Federal Statutes Relied Upon by the Court Provide the Necessary Discretion to Constitute Agency Action*

The court relies upon several provisions in the contracts between the BOR and its contractors, additional federal statutes, and various other factors trying to justify its conclusion that the BOR has discretion to reduce contract deliveries of available water to comply with the ESA. As the following discussion makes clear, however, none of these factors provides the necessary discretion.

### 1. *The Contract Provisions*

The court's ultimate conclusion—that the BOR has discretion to reduce deliveries of available water to comply with the ESA and prevent jeopardy to an endangered species—requires a careful look at the SJC repayment contracts with the City and the MRGCD, as well as the 1951 MRGCD rehabilitation and construction contract. By way of introduction:

Users' rights vary widely due to differences in reclamation contracts. While most can generally be classified as either repayment contracts or water

service contracts, their terms vary significantly by project and by district. Several important terms define users' rights to receive and use project water, including terms specifying the quantity of water to be delivered, the allocation of water during shortages, the lands and total acreage on which the water may be used, and the purposes for which the water may be used. While terms such as these vary among contracts, other terms—including an important provision relieving the government of liability for failure to deliver water for any reason—appear in reclamation contracts with high consistency.

Reed D. Benson, *Whose Water Is It? Private Rights and Public Authority Over Reclamation Project Water*, 16 Va. Envtl L.J. 363, 393–94 (1997) (footnotes omitted). The contracts of the parties in this case are more than water service contracts providing a long-term supply of water—they not only required the City and the MRGCD to pay periodic operation and maintenance costs of the SJC project, but also to repay the government for a share of project construction costs over 50 years. These latter payments were in consideration of a right to *use* that portion of the project water allocated to the respective entities.

None of the provisions relied upon by the court, alone or in combination and particularly against a backdrop of the authorizing legislation, support a conclusion that these contracts confer discretion on the BOR to reduce deliveries of available water and reallocate it in favor of an endangered species. Stated simply, far from being supported by the plain language of the contract or the shortage provisions, the BOR did not negotiate for or retain such discretion. *See Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032–33 (9th Cir.1989) (normal rules of contract construction apply to reclamation contracts). The court's odyssey through the contracts and other legislation (no matter how generally related, including the Fish and Wildlife Coordination Act of 1958 and the Reclamation States Emergency Drought Relief Act of 1992) does not persuade me otherwise. The subsections that follow discuss in turn each of the contract provisions cited by the court to justify its conclusion.

a. The "all as amended or supplemented" Provisions

The court relies upon the preamble to the SJC repayment contracts providing that the government was acting pursuant to Federal Reclamation Laws "all as amended or supplemented," VI Aplt. (COA) App. 1182, 1198; IV Aplt. (MRGCD) App. 896, as well as the preamble to the 1951 MRGCD rehabilitation and construction contract stating it was made pursuant the Reclamation Act of 1902 "and acts amendatory thereof and supplementary thereto." I Aplt. (MRGCD) App. 155. The Flood Control Act of 1948, under which the 1951 MRGCD contract was executed, contains similar language describing the authority under which the Secretary of the Interior operates and specifically states "[t]his Act [Flood Control Act] shall be deemed a supplement to said Federal reclamation laws." Flood Control Act of 1948, Pub.L. No. 80–858, § 203, 62 Stat. 1171, 1179.

Far from an incorporation of the ESA, the contract provisions deal with the source of the government's authority to enter into the contracts. Though the ESA is not an amendment to the federal reclamation laws, it probably does supplement the reclamation laws where an agency enjoys discretion. But as noted, no court has held that the ESA expands an agency's existing authority or discretion, and there

is no law specific to this project expanding the BOR's discretion and amending prior reclamation law. *See American Forest & Paper Ass'n,* 137 F.3d at 298–99 (ESA confers no substantive powers); *O'Neill v. United States,* 50 F.3d 677, 681 (9th Cir. 1995) (subsequent amendment of reclamation law directing BOR to meet ESA obligations). In the event that Congress were to amend the specific reclamation laws applicable to the SJC project to require reductions in contract amounts to benefit endangered species, the contracts have a specific provision calling for renegotiation of the contract at the contractor's option. ¶ 25, VI Aplt. (COA) App. 1195; ¶ 12i, IV Aplt. (MRGCD) App. 903; *see also O'Neill,* 50 F.3d at 683.

*Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), is not to the contrary. The Court recognized that the ESA might, "on occasion, require agencies to alter ongoing projects in order to fulfill the goals of the Act." *Id.* at 186, 98 S.Ct. 2279. But the examples discussed in support of that proposition all involve discretion whether it be (1) the Air Force altering bombing runs to avoid jeopardy to whooping cranes, (2) the Park Service protecting grizzly bears by supplying them excess elk carcasses, reducing clearcutting, and preventing hunting, or (3) the Tennessee Valley Authority not opening the Tellico Dam to protect the snail darter. *Id.* at 184–88, 98 S.Ct. 2279. None of these examples involve performance of existing government contracts where the contracts contain definite terms describing the parties' obligations and no unilateral discretion to advance the pur-

pose of an endangered species. Although the language in *Hill* is broad, facts do matter. *See Defenders of Wildlife v. Norton,* 257 F.Supp.2d at 67, 2003 WL 1737547, at *10 (In *Hill,* "the Supreme Court was not considering a situation in which an agency has no discretionary control over a proposed action, and 50 C.F.R. § 402.03 [requiring agency discretion] did not exist when the Court ruled."). It also bears noting that *Hill* involved a direct link between the project and endangered species jeopardy; here no such direct link exists.[4]

Although the court holds that the doctrine of unmistakable terms results in the incorporation of the ESA in the performance of these contracts, it is doubtful that the doctrine applies here in light of the sovereign power involved. "[T]he Federal Government, as sovereign, has the power to enter contracts that confer vested rights," *Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment,* 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986), but contracts with the government remain subject to subsequent legislation of the sovereign unless the sovereign has unmistakably waived the right to exercise such power. *United States v. Winstar,* 518 U.S. 839, 878, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). "[A]pplication of the doctrine ... turns on whether enforcement of the contractual obligation alleged would block the exercise of a sovereign power of the Government." *Id.* at 879, 116 S.Ct. 2432. Although the government has not surrendered its power to impose environmental laws on these contracts in unmistakable terms, *see Madera Irr. Dist. v. Hancock,* 985 F.2d 1397, 1406 (9th Cir.

---

**4.** Merely because SJC project water may be used to replace depletions in the Rio Grande basin, or that the parties' voluntarily entered into agreements to prevent jeopardy to the silvery minnow, does not equate with harm to the silvery minnow. Ct. Op. at 1132. The storage of water in Heron Reservoir has no

effect on the flows of the Rio Grande and does not harm the silvery minnow. If anything, the eventual release of that water from the reservoir, consistent with the primary beneficial uses intended, incidentally benefits the silvery minnow.

1993), the government does *not* seek to enforce the ESA by modifying contract deliveries because it interprets such enforcement to be contingent upon agency discretion, which is altogether lacking here. *Winstar*, 518 U.S. at 880, 116 S.Ct. 2432 ("So long as such a contract is reasonably construed to include a risk-shifting component that may be enforced without effectively barring the exercise of that power, the enforcement of the risk allocation raises nothing for the unmistakability doctrine to guard against, and there is no reason to apply it."). The government remains free to enforce the ESA in all matters in which it retains discretion. Thus, the government is free to encourage voluntary exchanges of water or lease water rights to further the purposes of the ESA. So focused, this inquiry avoids conflict with the government's solemn obligation to honor its contracts. *See Perry v. United States*, 294 U.S. 330, 352, 55 S.Ct. 432, 79 L.Ed. 912 (1935); *Union Pac. R.R. v. United States*, 99 U.S. 700, 719, 25 L.Ed. 496 (1878).

The court strongly implies that the federal defendants' failure to address the doctrine of unmistakable terms is a product of institutional bias in favor of irrigators. Conc. Op. at 1139 n. 1. There is no evidence whatsoever of this in the record. It is true that the doctrine of unmistakable terms does not appear to have been raised at the district court or on appeal by any party, even assuming that non-governmental parties may raise it independently. But it is strange to resolve a case on a non-jurisdictional issue under these circumstances. *See Transohio Savings Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598, 618 (D.C.Cir.1992) (characterizing the doctrine of unmistakable terms as a "rule of contract interpretation that applies to contracts with the government."); *see also Winstar*, 518 U.S. 839, 920, 116 S.Ct. 2432, 135 L.Ed.2d 964 (Sca-

lia, J., concurring in the judgment) (noting that "the doctrine has little if any independent legal force beyond what would be dictated by normal principles of contract interpretation."). Normally non-jurisdictional matters not briefed on appeal are considered waived. *See* Fed. R.App. P. 28(a)(9)(A), (b). Even in jurisdictional matters perhaps not recognized by the parties, our court routinely gives the parties notice of the probable jurisdictional defect and an opportunity to respond. Although this court may affirm a district court's judgment on alternative grounds not relied upon by the district court, we may do so only where the parties have had a fair opportunity to develop the record on those grounds. *See Seibert v. State of Okla. ex rel. Univ. of Okla. Health Sciences Ctr.*, 867 F.2d 591, 597 (10th Cir. 1989). Although the doctrine of unmistakable terms was mentioned at oral argument by the court, the Defendants have not been given an opportunity to refute or discuss this theory and therefore the district court's judgment should not be affirmed on this ground.

Sometimes things are what they appear to be, and it may well be that the parties did not raise the doctrine of unmistakable terms because no party thought the court would be so bold as to go where no court has gone before—to declare that the ESA applies even in the absence of pre-existing agency discretion over the subject matter. This is a remarkable proposition, and it squarely conflicts with the regulation on applicability declaring that "Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03. It also portends continuing discretion to amend post-ESA contracts at any time to address the needs of threatened or endangered species, a prop-

osition soundly rejected. *See Simpson Timber Co.,* 255 F.3d at 1082.

The court holds that even if the contracts do not provide the BOR with discretion to unilaterally reduce water deliveries in the absence of a shortage, "under the unmistakable terms doctrine the ESA nonetheless modifies the contracts because the contracts do not affirmatively state that future legislation will not apply." Conc. Op. at 1139. The court's view is that the ESA confers upon the BOR discretion "under the contracts themselves to change the contract terms and thereby comply with the mandates of the ESA." Conc. Op. at 1141. The logical error in the court's conclusion stems from its over-generalization. The BOR must comply with the ESA where it has discretion, *see* 50 C.F.R. § 402.02, *Action,* § 402.03, but there is nothing to comply with where the BOR does not have discretion over the subject matter. Moreover, this is not the usual case where the government relies upon the doctrine of unmistakable terms as a defense to contract performance; here private plaintiffs, not parties to the contract, seek to compel the government to breach the contract terms.

This would be a very different case if Congress were to enact legislation specifically directing the BOR to unilaterally reallocate SJC or MRGCD water to benefit an endangered species. If such were the case, the doctrine of unmistakable terms would clearly apply inasmuch as there is no "unmistakable" language in the contracts at issue providing that they are not subject to subsequent legislative enactments. *See Winstar,* 518 U.S. at 877–78, 116 S.Ct. 2432. Of course, Congress has not enacted specific legislation directing the BOR to deliver less than the full amount of available SJC and MRGCD water to its contractors so as to avoid jeopardy to an endangered species, and, as discussed above, the ESA applies only to federal agency actions in which there is "discretionary involvement or control." 50 C.F.R. § 402.03. Therefore, the court could not be more incorrect by asserting that the "unmistakable terms" analysis "does not turn on discretion." Conc. Op. at 1141. The outcome of this case does "turn on discretion," even under the unmistakable terms doctrine, for the simple reason that the subsequent legislative enactment invoked by the court under the unmistakable terms doctrine—the ESA—is inapplicable in the absence of discretion. Consequently, because the ESA cannot itself provide discretion where none already exists, and because the BOR has no discretion to modify the terms of the contracts at issue, the doctrine of unmistakable terms does not apply here.

b. The "Payment Schedule" and "Fish and Wildlife Function Costs" Provisions

The court also relies on a payment schedule for the City's allocable share of operation and maintenance costs of the reservoir, ¶ 7a, VI Aplt. (COA) App. 1188–89; as amended, X Aplt. (COA) App. 2449–50, and a provision concerning operation and maintenance costs attributed to the fish and wildlife function, ¶ 7b, VI Aplt. (COA) App. 1189; as amended X Aplt. (COA) App. 2450. The latter provision (prior to amendment) states:

Operation and maintenance costs attributed to the fish and wildlife function are estimated to be 5.6 percent of the annual operation and maintenance costs of the reservoir storage complex, excluding El Vado Dam and Reservoir. The City and other contractors will not be obligated to pay that portion of the annual operation and maintenance cost allocated to the fish and wildlife function. If unusual circumstances arise which throw the allocation out of balance, an appropriate

modification in the percentage figure will be made by the Contracting Officer. *Id.* The MRGCD contract for SJC water contains similar provisions. ¶¶ 7a & 7b, IV Aplt. (MRGCD) App. 900. The City's provision was amended in 1965 to include an estimate of 10.24 percent, given the City's relinquishment of a portion of its water allocation "to make water available for a permanent pool for fish and wildlife and recreation purposes at Cochiti Reservoir from the San Juan–Chama Project" pursuant to Congressional allowance of such purpose. X Aplt. (COA) App. 2446, 2450.

These provisions establish how certain costs of operation and maintenance of the reservoir storage complex will be distributed. The district court viewed the latter provision as "reducing contractors' costs to reflect a higher portion of water going to fish and wildlife needs," I Aplt. (COA) App. 98, but that says nothing about any entity having the discretion to allocate water in the absence of shortage. After all, the provision deals with cost distribution and exempts the City and the MRGCD from paying the portion of costs attributable to a "fish and wildlife function." Nothing in the contracts suggests that the "fish and wildlife function" gives to the BOR the right to reallocate water committed by contract to others, and instead use that water for instream flows benefitting fish and wildlife.

These provisions merely provide that if reservoir operation and maintenance costs associated with a fish and wildlife function increase—as they apparently did when the City relinquished a portion of its allocation in favor of Cochiti Reservoir—the cost distribution may need to be modified. Operation and maintenance costs for the reservoir storage complex do not encompass direct costs for provision of water to endangered species. And the fact that the City and the MRGCD do not have to pay for the operation and maintenance costs attributable to a fish and wildlife function suggests that the BOR lacks discretion to make them pay indirectly by unilaterally reallocating their water.

c. The Water Shortage and Non–Liability Provisions

The 1951 MRGCD contract with the BOR provides that:

> Should there ever occur a shortage in the quantity of water which normally would be available through and by means of said project works constructed in connection therewith, in no event shall any liability accrue therefor against the United States, or any of its officers, agents or employees for any damage direct or indirect arising therefrom and the payments to the United States provided for herein shall not be reduced because of any such claimed shortage or damage.

¶ 24, I Aplt. (MRGCD) App. 166. A similar provision in the City's contract provides that:

> On account of drought or other causes, there may occur at times during any year a shortage in the quantity of water available from the reservoir storage complex for use by the City pursuant to this contract. In no event shall any liability accrue against the United States or any of its officers or employees for any damage, direct or indirect, arising out of such shortage.

¶ 18b, VI Aplt. (COA) App. 1192. The MRGCD contract for SJC water contains a virtually identical provision. ¶ 12(b) IV Aplt. (MRGCD) App. 902.

The language in these provisions plainly applies to actual shortages caused by a lack of water that are beyond BOR control, thus making an immunity clause appropriate and suggesting that the duty to

allocate available water at this point is *non* discretionary. Paragraph 18j in the City's contract and ¶ 12i in the MRGCD's contract for SJC water, as required by the authorizing legislation, Pub.L. No. 87–483, § 11(a), 76 Stat. 96, 99–100 (1962), contain a provision for sharing of shortages— shortages occurring when the prospective runoff in the San Juan Basin (which is part of the Colorado River Basin) is insufficient in combination with storage to satisfy contract requirements. The non-liability provisions quoted above hardly suggest that the BOR has discretion to *reduce* water deliveries for any other reason, including shortages elsewhere. Moreover, even assuming such discretion in time of scarcity or shortage, the authorizing legislation and the SJC contracts require water deliveries to be proportionally reduced; they do not allow water to be reallocated to aid an endangered species.

The court construes the "other causes" language in the non-liability provisions in SJC contracts to invest the BOR with discretion to reduce contract deliveries to implement the ESA. This is an unreasonable interpretation. Surely the "other causes" language means causes external to the BOR that are unknown and unpredictable such as facilities failure that may result in the occurrence of a water shortage, as opposed to a shortage resulting from an ongoing duty to protect endangered species. The court's interpretation is not reasonable because it upsets the risk-shifting arrangement inherent in this provision, and it would be impossible for a contractor to predict (particularly at contract formation) when the provision might be applicable.

The non-liability provisions in these contracts, common in water agreements, *see* Benson, *Whose Water Is It?*, 16 Va. Envt'l L.J. at 394, are exculpatory. Their purpose is to "hold[ ] the United States harm-less from liability for damages arising by reason of shortages in irrigation water resulting from distribution or any other causes." *Orchards v. United States*, 4 Cl. Ct. 601, 612 (1984). They are defensive in nature, and to interpret them as affirmative grants of discretion to enforce the ESA and reduce contract deliveries in the absence of a shortage does violence to their language and intent.

d. The "Water Rights" Provision

The "Water Rights" provision in the BOR contract with the City grants the City the "exclusive right" to:

use and dispose of that share of the project water supply available and allocated to municipal water supply purposes. . . .

Water may be used or disposed of for any purpose desired by the City from time to time. . . . Such use or disposal may be by diverting and applying such water directly from the Rio Grande stream system, by diverting and applying underground water utilizing project water to offset the adverse effects of such underground withdrawals heretofore or hereafter made from the Rio Grande stream system, or otherwise as the City may desire.

¶ 18d; VI Aplt. (COA) App. 1192–93. The MRGCD contract for SJC water also contains a provision granting the district "the right to use and dispose of that share of the project water supply available and allocated to irrigation water supply purposes." ¶ 12d, IV Aplt. (MRGCD) App. 902.

Although the court reads the City's contract provision as "recogniz[ing] exchanges in project water for water from aquifers and the Rio Grande stream system native water," Ct. Op. at 1129, the provision speaks to permissible use or disposal of its project water at the *City's* option, not the BOR's. ¶ 18d; VI Aplt. (COA) App. 1192–

93. Discretion as to use within the terms of the contract is invested in the City, not the BOR. This is a critical distinction. These provisions recognize that the City (and the MRGCD) each have "a *permanent* right to the use of that portion of the project water supply allocated to its use herein," so long as each pays its share of costs. *Id.;* ¶ 12d, IV Aplt. (MRGCD) App. 902 (emphasis supplied). This permanent right extends for the duration of the contracts. ¶ 26, VI Aplt. (COA) App. 1192–93; ¶ 15, IV Aplt. (MRGCD) App. 903–04. Paragraph 26 of the City's contract provides that "the City has a vested right to renew said contract *indefinitely* at appropriate annual service charges so long as a water supply may be available and the City is current on its payments for water service." *Id.* at 1196. The MRGCD SJC contract contains similar provisions. ¶ 15, IV Aplt. (MRGCD) App. 903–04. According to the court, "indefinite" does not mean forever, Ct. Op. at 1134; according to the dictionary, "indefinitely" means "without specified or assignable limit or end; unlimitedly." Oxford English Dictionary (2d ed.1989).

Absent shortage, the BOR is empowered to restrict the City's water deliveries under the contract only where the City is more than 12 months delinquent in its payments for water supply costs based upon construction costs, or is in arrears in its advance payments for operating and maintenance costs. ¶ 16a(1) & (2), VI Aplt. (COA) App. 1191–92. A similar provision is included in the 1951 MRGCD rehabilitation and construction contract. It provides for a refusal of water where the MRGCD is in arrears in payment of charges due under the contract. IV Aplt. (MRGCD) App. at 887.

e. The Use and Allotment Provisions

The City's contract provides:

The project is designed to furnish an estimated firm yield from proposed storage for project use of approximately 101,800 acre-feet annually. Of this yield, 48,200 acre-feet shall be available annually to the City for use as a municipal water supply.

¶ 18j, VI Aplt. (COA) App. 1203. Similarly, MRGCD's contract contains the following provision:

The project is designed to furnish an estimated firm yield from proposed storage for project use of approximately 101,800 acre-feet of water annually. Of this amount, 20,900 acre-feet shall be available annually to the District for use as an irrigation water supply.

¶ 12i, IV Aplt. (MRGCD) 903. Both contracts contain scarcity provisions which provide that "[d]uring periods of scarcity when the actual available water supply may be less than the estimated firm yield, the [City/District] shall share in the available water supply in the ratio that allocations above bear to the estimated firm yield." ¶ 18j, VI Aplt. (COA) App. 1203; ¶ 12i, IV Aplt. (MRGCD) 903.

These provisions impose a mandatory duty upon the BOR to furnish available water supply in the quantities contracted for. The scarcity qualifications relate to scarcity or shortage caused by the lack of water from the San Juan Basin and storage; nothing suggests that the BOR has discretion to create a shortage so as to protect an endangered species jeopardized by drought conditions. Merely because a contract may provide the BOR with some discretion in one set of carefully limited circumstances beyond its control cannot serve as a basis to imply that the BOR has unlimited discretion in all areas involving water delivery. BOR's control of water deliveries does not give it power to reallocate unilaterally water committed by contract any more than a bailee by virtue of

possession of the bailed property may misdeliver that property for social good.

#### f. The "Other Uses" Provisions

The court also relies heavily on the contractual language stating that the project is "is authorized for furnishing water for irrigation and municipal uses and for providing recreation and fish and wildlife benefits, and for other beneficial purposes." ¶ 18h, VI Aplt. (COA) App. 1193; ¶ 12h, Aplt. (MRGCD) App. 903.

However, this court has recognized that the "recreation and fish and wildlife benefits" are incidental benefits of the SJC project, not primary purposes. *Jicarilla Apache Tribe v. United States,* 657 F.2d 1126, 1139 (10th Cir.1981).[5] Though the court finds it significant that the contract recognizes this fish and wildlife use, the next sentence of the provision suggests that the provision inures to the benefit, not the detriment of, the City: "The supply to be available for water users of the City, and the costs payable by the City for a municipal water supply reflect apportionment among these purposes and regulation of releases." ¶ 18h, VI Aplt. (COA) App. 1193; *see also* ¶ 12h, IV Aplt. (MRGCD) App. 903 (similar provision in the MRGCD SJC contract). The general purpose language about "fish and wildlife benefits" really says nothing about how water will be furnished for any of the mentioned uses-for that, one must read the balance of the contract. It certainly does not suggest that the quantities contracted for will be reduced for unstated fish and wildlife benefits, and, as discussed in the next section, nor does any statute fill that gap.

#### 2. The Federal Statutes

#### a. The Fish and Wildlife Coordination Act

The City suggests that the "Other Uses" provision was prompted by the Fish and Wildlife Coordination Act ("FWCA") of 1958, Pub.L. No. 85–624, 72 Stat. 563. *See* 16 U.S.C. §§ 661–666(c) (current version). This court relies upon the FWCA as another source of authority for the district court's order requiring consultation and an RPA. Ct. Op. at 1136 (relying upon §§ 662(a) & (c)). The FWCA "requires federal agencies to consult with the USFWS and to develop some plan for the mitigation of losses to fish and wildlife populations that might result from proposed agency actions although the USFWS has no authority to require the agency to adopt its recommendations." *Texas Comm. on Natural Res. v. Marsh,* 736 F.2d 262, 267 (5th Cir.1984); *see also id.* at 268 (noting that FWCA compliance can be challenged in a NEPA action, though no private right of action exists), *on reh'g,* 741 F.2d 823 (5th Cir.1984); *Zabel v. Tabb,* 430 F.2d 199, 209–10 (5th Cir.1970). The consultation and reporting requirements generally apply to the planning and construction stages of a project. S.Rep. No. 85–1981 (1958), *reprinted in* 1958 U.S.C.C.A.N. 3446. Moreover, use of the water for wildlife conservation purposes would require a general plan approved jointly by the federal agency exercising primary administration, the Secretary of the Interior

---

5. The fact that Congress in 1981 would legislatively authorize *storage* of SJC project water "for recreation and other beneficial purposes by any party contracting with the Secretary for project water," Pub.L. No. 97–140, § 5(a), 95 Stat. 1717, 1717 (1981), hardly elevates fish and wildlife benefits to a primary use and says nothing about *release* of water for that purpose. Appellant Rio Chama Acequia Association makes a compelling case that the primary purposes of the SJC Project were to provide municipal and industrial water supplies and to provide for irrigation in economically depressed areas. Aplt. (RCAA) Br. at 24–29.

and the head of the state wildlife agency. 16 U.S.C. § 663(b). The report supporting approval of the SJC project indicates that New Mexico stated its intention not to use project water for fish and wildlife purposes. Coordinated Report on the San Juan–Chama Project, H. Doc. No. 86–424, xxx, 19, *reprinted in* V Aplt. (COA) App. 746, 771.

Although a provision of the FWCA allows a federal agency to modify the operation of water-control projects to conserve wildlife, by its terms the provision applies to projects "the construction of which has not been substantially completed" on the date of the FWCA's enactment and the purpose of the modification must be "to accommodate the means and measures for such conservation of wildlife resources as an integral part of such projects." 16 U.S.C. § 662(c). Of course, this project is completed, and it is doubtful that providing water to an endangered species in times of drought could be characterized as an integral part of the SJC project. Regardless, such a general directive simply does not address the BOR's authority to reallocate project water to benefit wildlife when the project water is committed by contract.

### b. The Reclamation States Emergency Drought Relief Act

The court also relies upon the Reclamation States Emergency Drought Relief Act ("RSEDRA") of 1992 which allows the Secretary of the Interior to make water from federal reclamation projects available "for the purposes of protecting or restoring fish and wildlife resources." 43 U.S.C. § 2212(d). The fact that the governor of New Mexico declared a drought and requested relief under the Act in no way

alters contractual responsibilities. Section 2211(a) provides that "[c]onsistent with *existing contractual arrangements* and applicable State and Federal law, and without further authorization, the Secretary is authorized to undertake construction, management, and conservation activities that will minimize, or can be expected to have an effect in minimizing, losses and damages resulting from drought conditions." (emphasis supplied). Although the Secretary is authorized to consider temporary operational changes to mitigate fish and wildlife losses, the Secretary must act in a manner "consistent with the Secretary's other obligations" 43 U.S.C. § 2242, which surely includes honoring contractual obligations. Although it is argued that the ESA is another obligation imposed upon the Secretary, as discussed previously the ESA obligation is dependent upon discretion which is lacking here. The RSEDRA, while allowing the Secretary to benefit fish and wildlife in times of drought through voluntary transfers or allocation of uncommitted water supplies, does not alter existing contractual rights of the City or the MRGCD.[6] In fact, the intent of the provision to benefit fish and wildlife was to allow the Secretary to respond "in the same manner as he could respond to communities and individuals." S. Rep. 102–185, 12, *reprinted in* 1992 U.S.C.C.A.N. 55, 62. No one suggests that the Secretary could unilaterally reallocate contract water from one community or individual to another under the authority of the RSEDRA.

### c. The Colorado River Storage Project Act

Nor does the Colorado River Storage Project Act, specifically 43 U.S.C. § 620g,

---

6. For what it is worth, the City and the State of New Mexico point out that in enacting the RSEDRA, Congress rejected a provision "which would have given the Secretary authority, during a drought, to have water users forego their contractual entitlement so that

the water could be made available to urban areas and for wildlife habitat." 127 Cong. Rec. S18643 (daily ed. Nov. 27, 1991) (statement of Sen. Wallop). Aplt. (State) Reply Br. at 26; Aplt. (City) Reply Br. at 28.

which authorizes the Secretary "to investigate, plan, construct, operate and maintain ... facilities to mitigate losses of, and improve conditions for, the propagation of fish and wildlife," invest the BOR with necessary discretion. Like similar language in the FWCA and the RSEDRA, this authority does not include the power to reallocate available water committed by contract.

### 3. *Other Factors*

In addition to the contract provisions and federal statutes discussed above, the court relies on various other factors to justify its conclusion that the BOR retains discretion to reduce deliveries of water so as to avoid jeopardy to the silvery minnow. For example, the court points to the absence of any contractual provision specifying "absolute" amounts of water in the SJC contracts. The court determines that because there is a potential fluctuation in the "actual available water" and "estimated firm yield," and because the BOR has discretion to reduce contract deliveries for "other causes," the BOR has discretion to reduce available water. Ct. Op. at 1129.

The problem with this reasoning is that it is completely at odds with the authorizing legislation and a central purpose of the project—insuring an estimated firm yield of 96,200 acre-feet by diverting and storing water in Heron Reservoir in years with above average precipitation and runoff, and using that water to avoid a shortfall in years with below average precipitation and runoff so as to provide contractors with available water. The authorizing legislation provides that "[t]he Secretary shall not enter into contracts for a total amount

of water beyond that which, in his judgment, in the event of shortage, will result in a reasonable amount being available for the diversion requirements for the Navajo Indian irrigation project and the initial stage of the San Juan–Chama project as specified in sections 2 and 8 of this Act." [7] Pub.L. No. 87–483, § 11(a), 76 Stat. 96, 100 (1962). The project works precisely because of these limitations. Although Plaintiffs suggest that the BOR could release more water than the firm yield, Aplee. Br. at 75–80, the government responds that this would defeat the purpose of the project and the small portion of the firm yield not already contracted for is reserved for Taos Pueblo. Aplt. Reply Br. at 16–17. Moreover, the contracts provide that existing contractors have first rights to uncommitted water. "During periods of abundance when the actual available water supply may be more than estimated firm yield, the City shall have the right to share in the actual available water supply in the ratio that the allocations above bear to the estimated firm yield, all as determined by the Contracting Officer." ¶ 18j, VI Aplt. (COA) App. 1203; IV Aplt. (MRGCD) App. 903 (similar provision in MRGCD SJC contract).

The court's reasoning is also inconsistent with purpose of the City's contract as reflected in the recital of the parties' purpose of the City "obtaining, securing, and supplementing its water supply, such water to be for municipal purposes," VI Aplt. (COA) App. 1182, and agreeing to pay a share of the construction costs "to obtain, secure and supplement its water supply." ¶ 4(a), VI Aplt. (COA) App. 1185, as amended VI Aplt. (COA) App. 1199. It is also inconsistent with the purpose of the

---

7. Section 2 relates to furnishing irrigation water to the Navajo Indian Irrigation Project and § 8 relates to furnishing water supplies to the "Middle Rio Grande Conservancy District and for municipal, domestic, and industrial uses, and providing recreation and fish and wildlife benefits."

MRGCD's contract as reflected in the recital of the parties' purpose that the MRGCD "acquire a supplemental supply of water to be used for the irrigation of irrigable and arable lands." IV Aplt. (MRGCD) App. 897. Merely because the BOR determines the amount of available water for authorized uses and contracts does not mean it can declare less water available after diverting some to uses of the court's choosing.

The court also cites the City's contract with the BOR to augment the water supply of the Middle Rio Grande Valley. In 1997, the BOR contracted with the City to purchase SJC water to augment the water supply of the Rio Grande Valley. According to the court, this reflects "the City's commitment to protecting the silvery minnow." Ct. Op. at 1134 n. 36. Only were we to conclude that no good and voluntary deed goes unpunished would this have any relevance to a forced taking of the City's water for this purpose in drought conditions. There is a world of difference between the City's voluntary response and a forced response under the guise of contract and statutory interpretation.

## C. *The Cases Relied Upon by the Court Are Distinguishable*

Both the district court and this court rely upon a trio of Ninth Circuit cases that are readily distinguishable, though we are not bound to follow them. In *O'Neill v. United States*, 50 F.3d 677 (9th Cir.1995), the Ninth Circuit upheld a district court determination that a long-term water service contract did not obligate the government to comply with its full contractual commitments when the water could not be delivered consistently with the requirements of the ESA and the Central Valley Project Improvement Act ("CVPIA"). *Id.* at 680. The CVPIA, enacted in 1992, constituted a shift in reclamation law subse-

quent to the contracts, and specifically required the BOR to provide 800,000 acre-feet of project water for fish and wildlife and habitat restoration and compliance with future obligations under the ESA. *Id.* at 686, 689 n. 7; Reclamation Projects Authorization and Adjustment Act of 1992, Pub.L. No. 102–575, § 3406(b)(2), 106 Stat. 4600, 4715–16. In response to the argument that the government would be liable for its failure to deliver the water to contractors, the court held that the "contract's liability limitation is unambiguous and that an unavailability of water resulting from the mandates of valid legislation constitutes a shortage by reason of 'any other causes.'" *O'Neill*, 50 F.3d at 684. Not surprisingly, the court also held that the contract was subject to future changes in reclamation law:

> Nothing in the 1963 contract surrenders in "unmistakable terms" Congress's sovereign power to enact legislation. Rather, the contract was executed pursuant to the 1902 Reclamation Act and all acts amendatory or supplementary thereto. The contract contemplates future changes in reclamation laws in Article 26, and Article 11 limits the government's liability for shortages due to any causes. As Area I recognized in its oral argument, CVPIA marks a shift in reclamation law modifying the priority of water uses. There is nothing in the contract that precludes such a shift.

*Id.* at 686 (citations omitted). In this case, we simply lack a future change in reclamation law that would invest the BOR with discretion to reduce contract deliveries for endangered species purposes. This court attempts to expand the holding of *O'Neill* by concluding that the ESA can serve as a future change to reclamation law. Ct. Op. at 1130 n. 28. As discussed above, the ESA does not create additional authority and does not expand the discretion of the BOR. A specific change to the San Juan–

Chama Project Act (or the Flood Control Act resulting in the 1951 MRGCD rehabilitation and construction contract) authorizing the BOR to reallocate water or change operations to benefit an endangered species is completely lacking in this case. *O'Neill* cannot be separated from the change in reclamation law lacking here.

In *Natural Res. Def. Council v. Houston*, 146 F.3d 1118 (9th Cir.1998), the Ninth Circuit again considered contract renewals pursuant to the CVPIA. The court held that contract renewals are plainly "agency action" under the ESA and that the BOR had discretion to reduce the amount of available project water to comply with the ESA or state law. *Id.* at 1125–26. As previously discussed, this case does not involve contract renewals. Subsequently, the Ninth Circuit has made clear that *Houston* turns on the discretionary nature of contract renewal terms, not on a freestanding right of the BOR to amend the contracts at any time to further the goals of the ESA. *Simpson Timber Co.*, 255 F.3d at 1082.

Finally, in *Klamath Water Users Protective Ass'n. v. Patterson*, 204 F.3d 1206 (9th Cir.1999), the court held that various water users were not third-party beneficiaries of a 1956 contract between the BOR and a power company that operated a BOR project. *Id.* at 1211. The BOR established a new interim operating plan altering water flow levels to which the power company eventually agreed. *Id.* at 1209. The new plan was motivated not only by the ESA, but also by the necessity of compliance with various tribal fishing and water treaty rights. *Id.* The court held that the ESA, though passed subsequent to the contract, applied "as long as the federal agency retains some measure of control over the activity.... Therefore, when an agency, such as [the Bureau of] Reclamation, decides to take action, the ESA generally applies to the contract." *Id.* at 1213 (citations omitted). Central to the Ninth Circuit's holding were provisions indicating that "the United States retains overall authority over decisions on use of Project water," including a provision that the power company's decisions could be overridden by the BOR. *Id.* Accordingly, the court, interpreting but one of a multitude of Klamath project contracts, held "that [the Bureau of ] Reclamation has the authority to direct [project] operations to comply with the ESA." *Id.* As discussed above, the BOR simply has not retained the same measure of discretion when it comes to abrogating the contractual obligations at issue here; rather, it has provided the City and the MRGCD a quantifiable right to delivery of available water.

## D. *Conclusion*

This case has enormous significance. Although the contracts at issue establish certain bilateral rights and duties, the court's interpretation renders the contracts somewhat illusory because the BOR will have discretion to modify those rights and duties, thereby rendering uncertain the parties' settled contractual expectations. In the end, the court concludes that it is the government's "authority to manage MRGCD and SJCP works" that triggers the ESA obligations to consult and presumably reallocate water.[8] Ct. Op. at 1136. This is in considerable tension with Supreme Court authority (and the Reclamation Act, 43 U.S.C. §§ 372, 383) recognizing that the federal government gener-

---

**8.** Quite apart from the SJC project-water, only 12 percent of the MRGCD's diversionary water supply is project water—the rest is non-project water. The court's opinion essentially holds that the BOR also can displace the MRGCD's state-law water rights in its non-project water.

ally must respect state-law water rights and lacks any inherent water right in water originating in or flowing through federal property.[9] *See United States v. New Mexico,* 438 U.S. 696, 716–18, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978); *California v. United States,* 438 U.S. 645, 665, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978); *Ickes v. Fox,* 300 U.S. 82, 94–95, 57 S.Ct. 412, 81 L.Ed. 525 (1937); *United States v. City of Las Cruces,* 289 F.3d 1170, 1176 (10th Cir.2002); *Holguin v. Elephant Butte Irrigation Dist.,* 91 N.M. 398, 575 P.2d 88, 91–92 (1977); *Middle Rio Grande Water Users Ass'n v. Middle Rio Grande Conservancy Dist.,* 57 N.M. 287, 258 P.2d 391, 398 (1953). Under the court's reasoning the ESA, like Frankenstein, despite the good intentions of its creators, has become a monster. The ESA was never meant to allow the federal government, on behalf of endangered species, to overturn this established precedent. The BOR merely operates the works; it lacks any reserved or acquired water right (let alone with priority) that would allow it unilaterally to take and use the water for the sole benefit of an endangered species. *See Nevada v. United States,* 463 U.S. 110, 126, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983). It matters not that reclamation projects are heavily subsidized or viewed as a bad bargain by some; the government is not free to breach those contracts. The court's alternative holding, that this practice can be justified by the ESA (as incorporated into the contracts via the doctrine of unmistakable terms) regardless of whether the contracts confer discretion, is unprecedented. I would vacate the district court's injunc-

tion with directions to remand this matter to the FWS for further ESA consultations in view of what I believe to be the properly limited scope of the BOR's discretion.

---

**9.** The court cites *Ivanhoe Irrigation Dist. v. McCracken,* 357 U.S. 275, 291, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958) and *Israel v. Morton,* 549 F.2d 128, 132 (9th Cir.1977), in support of a distinction between acquiring water rights and operating federal projects. Both *Ivanhoe* and *Israel* involve federal restrictions on supplying project water to excess land. They do not involve a unilateral reduction of contract deliveries by the government in favor of another use that may not be consistent with state law. We have consistently recognized the primacy of state law after release of the water. *United States v. City of Las Cruces,* 289 F.3d 1170, 1176 (10th Cir.2002); *Jicarilla Apache Tribe,* 657 F.2d at 1137.